William L. Dickinson and the other plaintiffs in an action filed in the Montgomery *Page 262 
Circuit Court appeal from that court's final order dismissing the action for lack of subject-matter jurisdiction. We affirm.
 I. Factual Background
The plaintiffs, William L. Dickinson and 18 other Alabama political candidates and campaign committees for state or federal elected office (hereinafter "the candidates"),[1] sued various television-broadcast stations[2] alleging breach of contract; negligence, wantonness, or willfulness; money had and received; misrepresentation; and fraudulent suppression. Each claim arises from the purchase of advertising time on the defendant television stations preceding the primary and general elections of 1986, 1988, and 1990. The contract and tort claims allege that the television stations failed to fulfill the terms of their contracts with the candidates and violated federal law by charging more than the "lowest unit charge."
Each candidate signed a form contract printed by the National Association of Broadcasters, in order to advertise on the television stations. This contract included the following language:
 "It is my understanding that: If the time is to be used by the candidate himself within 45 days of a primary or primary runoff election, or within 60 days of a general or special election, the above charges represent the lowest unit charge of the station for the same class and amount of time for the same period. . . . It is agreed that use of the station for the above-stated purposes will be governed by the Communications Act of 1934, as amended, and the FCC's rules and regulations, particularly those provisions reprinted on the back hereof, which I have read and understand." *Page 263 
(Emphasis added.) As stated in the contract, various provisions of the Communications Act of 1934 are listed on the back of the contract. One of those provisions, 47 U.S.C. § 315(b), contains the statutory requirement that television stations charge the "lowest unit charge" for political-campaign advertisements during the prescribed periods before elections.
The "lowest-unit-charge" requirement is not only an element of the contracts between the candidates and the stations, but is imposed upon federally regulated broadcasters as part of a comprehensive statutory and regulatory scheme to provide legally qualified candidates for political office with reasonable and affordable access to the airwaves. See47 U.S.C. § 315(a) et seq.;[3] S. Rep. No. 96, 92d Cong., 1st Sess. (1971), reprinted in 1972 U.S. Cong. Ad. News 1773. The "lowest unit charge" is a calculation of a station's advertising rates determined by analyzing a multitude of factors, such as "most favored" advertiser rates, classes of time, rotation schedules, rebates, package plans, "make good" times, sold out times, and other components used to determine broadcast advertising rates. See In re Codification of the Commission'sPolitical Programming Policies, 7 F.C.C.R. 678 (1991).
Like many other ratemaking procedures, determining the "lowest unit charge" is a complex process. Congress specifically designated the Federal Communications Commission ("FCC") to enforce "lowest-unit-charge" compliance "because [the FCC] has the expertise necessary to make such determinations based upon its understanding of the complex and often arcane practices of the broadcast advertising industry." In re:Exclusive Jurisdiction with Respect to Potential Violations of the LowestUnit Charge Requirements of Section 315(b) of the Communications Act of1934, as Amended, 6 F.C.C.R. 7511 ¶ 15 (1991), on reconsideration, 7 F.C.C.R. 4123 (1992) ("1991 FCC Declaratory Ruling").
In response to this lawsuit and to other similar litigation, the FCC initiated proceedings to consider: (1) whether claims that involve "lowest unit charges" and other elements of § 315(b) compliance fell under the exclusive original jurisdiction of the FCC, pursuant to its authority to enforce § 315(b), or (2) whether the claims were properly to be brought in a state court or in a federal court. SeeNotice of Intention to Issue Declaratory Ruling with Respect to ExclusiveAuthority of FCC to Determine Whether Broadcasters Have Violated LowestUnit Charge Requirement of Section 315(b), 6 F.C.C.R. 5954 ¶¶ 2-6 (1991).
The FCC has broad regulatory authority over broadcasters. Since the enactment of the Communications Act of 1934, the FCC has been charged with the responsibility for enforcing federal policy in the broadcasting field. *Page 264 
 "Federal regulation of broadcasting, whether by radio or television, is comprehensive. By the Communications Act's licensing provision federal law governs who may broadcast and over what frequencies. Under that statute and the regulations adopted pursuant to it, broadcast licenses may be issued only after the Federal Communications Commission (FCC) determines that issuance is in the public interest. Licensees' broadcasting discretion is subject to a number of important limits such as the personal attack rule, the fairness doctrine, the prime-time access rule, and the equal opportunity rule. Federal regulations also govern billing for media advertising, refusal to sell advertising time, sponsorship information, alcoholic beverage advertising, amounts of commercial time, penalties for false, misleading, or deceptive advertising, loudness of commercials, and the number of commercials permitted during a given program."
KVUE, Inc. v. Moore, 709 F.2d 922, 932 (5th Cir. 1983), aff'd,465 U.S. 1092 (1984) (internal footnotes omitted).
Many of the parties to this lawsuit contributed their opinions during a notice and comment period. Afterwards, the FCC issued the 1991 FCC Declaratory Ruling, in which it declared:
 "[A]ny state cause of action dependent on any determination of the lowest unit charge under Section 315(b) of the Communications Act, or of some other duty arising under that subsection, is preempted by federal law. The sole forum for adjudicating such matters shall be this Commission."
6 F.C.C.R. 7511 ¶ 1. The FCC, fearing that various courts could interpret the requirements of § 315(b) in disparate ways and thus thwart the goal of a unified regulatory system for the broadcast industry, declared that it would be the sole forum in which to bring such a claim. Id. at ¶ 7. The intention was to prevent piecemeal and potentially contradictory resolution of disputes involving the computation of the "lowest unit charge."
 II. Overview
Our analysis of this case must necessarily involve two distinct steps. The first is to determine whether the candidates' claims are dependent upon or arise from a determination of § 315(b). We find the candidates' claims are dependent upon or arise from § 315(b). The second is to determine the jurisdictional consequences of the fact that the candidates' claims are dependent upon or arise from § 315(b). We find the 1991 FCC Declaratory Ruling ousts Alabama courts of jurisdiction and creates jurisdiction exclusively with the FCC. We are persuaded that the 1991 FCC Declaratory Ruling is an "order" subject to challenge only in a United States Court of Appeals. Thus, this Court cannot entertain a collateral attack on its validity. However, even if the 1991 FCC Declaratory Ruling were not an "order," as the candidates argue before us, we conclude that the Declaratory Ruling is a properly exercised regulatory interpretation by the FCC and therefore subject to judicial deference.
 III. The Relation of the Claims to Section 315(b)
The first question this Court must address is whether the candidates' claims are dependent on, or arise from, a duty imposed by § 315(b), and thus lie within the ambit of the 1991 FCC Declaratory Ruling. If the candidates' five counts are standard contract and tort claims and are not dependent on, or do not arise from, a duty imposed by § 315(b), then the FCC *Page 265 
does not have jurisdiction over the matter. See The Law of PoliticalBroadcasting and Cablecasting: A Political Primer, 100 F.C.C.2d 1476 (1984) ("The FCC has always taken the position that it cannot settle disputes over contracts between the more than 9,500 broadcasting stations and their advertisers. Such disputes can best be settled by negotiations between the two parties or in civil actions in the local courts."). If the candidates' claims are not preempted by federal law, then the State of Alabama has an interest in vindicating the rights of its citizens and providing a forum for adjudication of their claims.
The candidates have crafted their complaint to avoid any mention of § 315(b), apparently trying to avoid FCC preemption of their claims. However, an analysis of the separate claims reveals that each one, at its core, is integrally related to § 315(b) and cannot exist independently of that statutory provision. It would be folly to allow the candidates to shape the language of their complaint in a manner that converts what are essentially federal-law claims into state-law claims. See the 1991 FCC Declaratory Ruling, 6 F.C.C.R. 7511 ¶ 5 n. 9 (quoting Zell Miller for Governor v. Pacific Southern Co., No. 1:91-CV-RLV, slip op. at 11-12 (N.D.Ga. June 4, 1991) (not published in F. Supp.)).
Initially, the candidates allege breach of contract. The basis of this claim is that the contracts between the candidates and the television stations contained a clause in which the stations agreed to charge the candidates the "lowest unit charge" for political advertisements, and that the stations overcharged them by charging a rate higher than the contract price. "`Breach' consists of the failure without legal excuse to perform any promise forming the whole or part of the contract."McGinney v. Jackson, 575 So.2d 1070, 1071-72 (Ala. 1991) (citing 17 Am.Jur. 2d Contracts § 441 at 897 (1964)). The candidates cannot prove performance or nonperformance under the contract without resorting to a determination of the "lowest unit charge." Therefore, the breach-of-contract claim is facially and explicitly dependent[4] on a determination of the "lowest unit charge." Without the statutory language incorporated into the contract, the term "lowest unit charge" has no meaning. Thus, this claim is preempted by federal law.
Next, the candidates assert a claim of "negligence, wantonness, or willfulness." The candidates' complaint states that because "[e]ach defendant operates its respective television station under a broadcast license issued by the Federal Communications Commission," the stations have "an affirmative duty to provide political candidates with reasonable access to the lowest unit charge for advertising." See the second amendment to the complaint, at ¶ 68. The candidates then state that the stations violated what the candidates describe as an affirmative duty; that the stations violated it intentionally, negligently, wantonly, or willfully; and that the candidates were damaged as a result. The 1991 FCC Declaratory Ruling details two causes of action that are specifically preempted by federal law and that are subject to exclusive FCC jurisdiction. The first is a dispute "dependent on" § 315(b), and the second is a dispute "arising from a duty imposed by" § 315(b). This second count is entirely *Page 266 
premised upon an asserted affirmative duty owed to the candidates by the stations to provide the "lowest unit charge." It is disingenuous for the candidates to assert that this could be an independent state-law tort claim when it is inextricably linked to the stations" statutory and contractual obligation to provide candidates the "lowest unit charge" for advertising rates.
The candidates' third claim is for "money had and received." This is essentially a derivative claim of fraud. The candidates assert that the defendant stations overcharged them and are therefore in possession of money that is not rightfully theirs.
 "The essence of the theories of unjust enrichment or money had and received is that a plaintiff can prove facts showing that defendant holds money which, in equity and good conscience, belongs to plaintiff or holds money which was improperly paid to defendant because of mistake or fraud."
Hancock-Hazlett Gen. Constr. Co. v. Trane Co., 499 So.2d 1385, 1387
(Ala. 1986) (citing Foshee v. General Tel. Co. of the Southeast,295 Ala. 70, 322 So.2d 715 (1975); Wash v. Hunt, 281 Ala. 368,202 So.2d 730 (1967)). A complete defense to this claim is that the stations did not improperly overcharge the candidates, and consequently are not in possession of money not rightfully theirs. The only means of resolving this claim is to determine the "lowest unit charge." The claim is completely derivative of the fraud claims, and thus cannot stand as a separate state-law claim.
The candidates' fourth claim alleges that the stations knowingly misrepresented to them that they would be charged the "lowest-unit-charge" rate. Again, we note that it is impossible to divorce the two concepts of "lowest unit charge" as prescribed by § 315(b) and the candidates' claim of misrepresentation. The only method by which the television stations can establish the proper legal performance of their contractual obligations is by looking to a determination of § 315(b) charges. This is precisely the area of law preempted by the FCC in its 1991 Declaratory Ruling.
The final claim alleged by the candidates is fraudulent suppression. The candidates assert that the stations were in a position of superior knowledge of the advertising-rate structures and were therefore under a duty to disclose the proper amount to be billed to the campaigns, and that they failed to do so. Because the basis of this claim is that the stations had a duty arising under § 315(b), even the most talented wordsmith cannot avoid the obvious conclusion that the 1991 FCC Declaratory Ruling, asserting primary original jurisdiction over any cause of action dependent on a "duty arising under that subsection [315(b)]," clearly manifests the FCC's intent to cover this kind of claim. Merely avoiding any reference to § 315(b) and couching the claim in terms of fraudulent suppression cannot alter the fact that any duty the stations may have had to supply true facts to the candidates would have arisen from the contract containing the language of § 315(b) and the language of the statute operating independently of the contract. Because the candidates' claim of fraudulent suppression cannot persist without integral reference to § 315(b), the claim is within the realm of FCC preemption.
Each of the five claims the candidates asserted against the stations is premised, at base, on a determination of each station's "lowest unit charge" or upon a duty imposed by § 315(b). Because the claims are so intimately intertwined with a determination of the "lowest-unit-charge" formula, the claims cannot exist as distinct *Page 267 
state-law tort and contract claims, but instead are subsumed by the 1991 FCC Declaratory Ruling. Proper original jurisdiction thus lies with the FCC.
 IV. The Effect of the 1991 FCC Declaratory Ruling
Having determined that the candidates' claims are dependent on, or arise from, a duty imposed by § 315(b), we must now address the question whether the 1991 FCC Declaratory Ruling properly states that federal law preempts the candidates' state-law tort and contract claims.
The candidates rely upon the language from Miller v. FCC, 66 F.3d 1140,1144 (11th Cir. 1995), cert. denied, 517 U.S. 1155 (1996), that characterizes the 1991 FCC Declaratory Ruling as the mere "opinion" of the FCC and concludes that it is not "a decision, a letter of admonition, or an order levying a penalty of forfeiture, a loss of operating authority, or a refund to the candidate." In Miller, the candidates in this action, along with other similarly situated candidates from Georgia, asked the United States Court of Appeals for the Eleventh Circuit to invalidate the 1991 FCC Declaratory Ruling and declare that federal law does not preempt state-law claims derived from47 U.S.C. § 315(b). Id. at 1140. The Eleventh Circuit dismissed the action on Article III grounds, holding that the candidates had presented only a hypothetical question rather than an actual case or controversy.Miller, 66 F.3d at 1140.
The 1991 FCC Declaratory Ruling also was considered in separate litigation in California. In Wilson v. A.H. Belo Corp., 87 F.3d 393, 397
(9th Cir. 1996), the United States Court of Appeals for the Ninth Circuit held that the 1991 FCC Declaratory Ruling "fits the statutory definition of an `order.'" The Administrative Procedure Act ("APA") provides that "[t]he agency, with like effect as in the case of other orders, and in its sound discretion, may issue a declaratory order to terminate a controversy or remove uncertainty." 5 U.S.C. § 554(e). The Ninth Circuit held that "the FCC issued the Declaratory Ruling to terminate controversy and to remove uncertainty with respect to political advertisements and the `lowest unit charge' requirement." Wilson, 87 F.3d at 397. When the United States Supreme Court has not yet ruled on a federal-law issue and there is a split of authority among the various federal courts of appeals on that issue, "this Court is free to select the interpretation it considers most sound." Ex parte Bozeman,781 So.2d 165 (Ala. 2000).
We find the reasoning of the Ninth Circuit more persuasive and conclude that the 1991 FCC Declaratory Ruling qualifies as a final order.
 "As a general matter, two conditions must be satisfied for agency action to be `final': First, the action must mark the `consummation' of the agency's decisionmaking process[;] . . . it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which `rights or obligations have been determined,' or from which `legal consequences will flow.'"
Bennett v. Spear, 520 U.S. 154, 177-78 (1997) (internal citations omitted).
The 1991 FCC Declaratory Ruling squarely meets both prongs of theBennett test. First, the Declaratory Ruling represents the consummation of the FCC's decisionmaking process because it was adopted only after a notice and comment period and was subject to reconsideration. See 1991 FCC Declaratory Ruling, 6 F.C.C.R. 7511 (1991), on reconsideration, 7 *Page 268 
F.C.C.R. 4123 (1992). Second, definite legal consequences flow from its adoption. The exclusive original jurisdiction for claims dependent on, or arising from, a duty imposed by § 315(b) is limited to the FCC itself. We consider the ousting of state circuit courts and federal district courts of subject-matter jurisdiction to be an important "legal consequence."
Because we find the 1991 FCC Declaratory Ruling to be a final order, we conclude that the substance of the Declaratory Ruling is reviewable only by a federal court of appeals.
 "The court of appeals (other than the United States Court of Appeals for the Federal Circuit) has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of — (1) all final orders of the Federal Communications Commission made reviewable by section 402(a) of title 47."
28 U.S.C. § 2342. See, also, FCC v. ITT World Communications, Inc.,466 U.S. 463 (1984). This Court cannot entertain a collateral challenge to the validity of the 1991 FCC Declaratory Order, nor can Alabama courts provide a forum in which the candidates can attack the order. The proper forum for adjudicating the claims brought by the candidates is the FCC.
However, even if the 1991 FCC Declaratory Ruling were not a final order, we still would hold that the Ruling represents a proper exercise of regulatory authority by the FCC. Unlike the Eleventh Circuit inMiller, we are confronted with a live controversy. We find the 1991 FCC Declaratory Ruling makes sense in light of the FCC's comprehensive role in regulating the television-broadcast industry. Courts should generally defer to a permissible construction of a statute by the agency charged with its enforcement.
 "It is settled that courts should give great weight to any reasonable construction of a regulatory statute adopted by the agency charged with the enforcement of that statute. The Comptroller of the Currency is charged with the enforcement of banking laws to an extent that warrants the invocation of this principle with respect to his deliberative conclusions as to the meaning of these laws."
Clarke v. Securities Indus. Ass'n, 479 U.S. 388, 403-04 (1987) (quotingInvestment Co. Inst. v. Camp, 401 U.S. 617, 626-27 (1971)). See, also,Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,467 U.S. 837 (1984); QCC, Inc. v. Hall, 757 So.2d 1115, 1119 (Ala. 2000).
We agree with the substance of the FCC's Declaratory Ruling, that federal communications law preempts state causes of action for claims dependent upon, or arising from, a duty created by § 315(b). The FCC's regulation of television broadcasting is pervasive, and Congress has invested the FCC with the power to enforce the Communications Act of 1934. See KVUE, Inc. V. Moore, 709 F.2d 922 (5th Cir. 1983). Furthermore, 47 U.S.C. § 315(d) specifically grants the FCC the power to "prescribe appropriate rules and regulations to carry out the provisions of this section." This enforcement clause has been construed as "a congressional direction to the FCC to recognize the importance of this particular section of the statute and to prescribe separate rules and regulations to deal with the multitudinous situations that arise in applying it to all federal, state and local candidates for office throughout the nation." Kay v. FCC, 443 F.2d 638, 643-44 (D.C. Cir. 1970).
We also find persuasive the FCC's view that violations of the Communications Act *Page 269 
of 1934 have not traditionally been seen to provide a private cause of action. See Forbes v. Arkansas Educ. Television Communication NetworkFound., 22 F.3d 1423 (8th Cir. 1994) (holding that there is no private cause of action to enforce the "equal-time" provision of the Communications Act); Lechtner v. Brownyard, 679 F.2d 322 (3d Cir. 1982) (stating that the "personal-attack rule" does not provide a private cause of action); Belluso v. Turner Communications Co., 633 F.2d 393 (5th Cir. 1980) (finding no private cause of action for violations of the "equal-opportunity" provisions of the Communications Act); Daly v.Columbia Broad. Sys., Inc., 309 F.2d 83 (7th Cir. 1962) (holding that § 315(a) neither creates nor authorizes private causes of action);Arons v. Donovan, 882 F. Supp. 379 (D.N.J. 1995) (concluding that the obligation of broadcasters to operate in the "public interest" does not create private causes of action).
The candidates argue that applying the Declaratory Ruling retroactively violates their substantive-due-process rights. We cannot agree. In Alabama, retroactivity is generally disfavored. See Alabama Home BuildersLicensure Bd. v. Grzelak, 705 So.2d 406 (Ala.Civ.App. 1997). However, when a lawmaking body thoughtfully considers the burdens and benefits of retroactively applying a law and makes clear its intent that the law have legal consequence in pending cases, courts must follow the law's intent. See Landgraf v. USI Film Prods., 511 U.S. 244, 272 (1994). This is especially true in cases that merely change the jurisdiction from one forum to another.
 "We have regularly applied intervening statutes conferring or ousting jurisdiction, whether or not jurisdiction lay when the underlying conduct occurred or when the suit was filed. . . . Application of a new jurisdictional rule usually `takes away no substantive right but simply changes the tribunal that is to hear the case.'"
Landgraf, 511 U.S. at 274 (citing Hallowell v. Commons, 239 U.S. 506
(1916)). Landgraf reflects the situation in this matter, where federal law has ousted state courts of jurisdiction. The candidates still are able to seek a remedy for their alleged wrong — they simply cannot seek it in the Alabama court system. In this matter, the intent of the FCC and the apparent need for the Declaratory Ruling are clear. The 1991 FCC Declaratory Ruling was adopted in part because of this litigation.
Furthermore, the candidates do not possess "matured" state-law claims. They never had claims under state law. Without jurisdiction, a court has no power to act. In this case, jurisdiction was never proper in the Alabama circuit court; thus, Alabama courts had no power to remedy any alleged wrong.
The candidates' final argument is that the "saving clause" of the Communications Act of 1934 precludes federal preemption of their claims. The clause states that the Act does not "abridge or alter the remedies now existing at common law. . . ." 47 U.S.C. § 414. We cannot agree with such a broad interpretation of this clause. Their remedy did not exist at common law. The United States Supreme Court has held that the Communications Act preempts state-law libel actions and provides federal immunity for broadcasts regulated by § 315. See Farmers Educ. Coop. Union v. WDAY, Inc., 360 U.S. 525 (1959). The Court states that it has "not hesitated to abrogate state law where satisfied that its enforcement would stand `as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" WDAY,360 U.S. at 535 (1959) (footnote omitted). Analyzing the effect of *Page 270 47 U.S.C. § 414 as applied to a state-law breach-of-contract action against a long-distance telephone carrier, Judge Posner of the United States Court of Appeals for the Seventh Circuit has held that a literal reading of § 414 "would empower state courts to gut the federal regulatory scheme." Cahnmann v. Sprint Corp., 133 F.3d 484, 488 (7th Cir. 1998), cert. denied, 524 U.S. 952 (1998). The Seventh Circuit stated that even though the "saving clause" is broadly written, it cannot be used to evade substantive FCC regulation. Id. We find the reasoning in Cahnmann compelling and agree that the candidates cannot by filing carefully worded pleadings in a state court avoid the reality that their claim is fundamentally a federal claim.
"`The question of jurisdiction is always fundamental, and if there is an absence of jurisdiction over either the person, or the subject matter, a court has no power to act, and jurisdiction over the subject matter cannot be created by waiver or consent.'" Mobile Gulf R.R. v.Crocker, 455 So.2d 829, 831 (Ala. 1984) (citing Norton v. Liddell,280 Ala. 353, 194 So.2d 514 (1967)).
 V. Conclusion
The trial court correctly declined to exercise jurisdiction in this matter. All the candidates' claims are preempted by federal law, and the proper forum for their adjudication is the FCC.
AFFIRMED.
HOOPER, C.J., and MADDOX, HOUSTON, COOK, BROWN, JOHNSTONE, and ENGLAND, JJ., concur.
SEE, J., recuses himself.
[1] The plaintiffs are: William L. Dickinson, Second District Campaign Committee; William J. Cabaniss, Friends of Bill Cabaniss; Ronnie Flippo, Flippo for Governor Committee; Spencer T. Bachus III, Bachus for Attorney General Committee; John Teague; Jeremiah A. Denton, Denton for Senate Committee; James E. Folsom, Jr., Jim Folsom, Jr. for Lieutenant Governor Committee; Fob James, Fob James for Governor Committee; Kenneth D. Wallis, Alabamians for Ken Wallis; George D.H. McMillan, Jr., The McMillan Committee; George Wallace, Jr., Wallace for Treasurer Committee; Charles A. Graddick, Graddick for Governor Committee; William J. Baxley, Friends of Bill Baxley; Richard Shelby; Paul Hubbert; Don Siegelman; Jimmy Sullivan; Sonny Hornsby, Friends of E.C. Hornsby, Friends of Sonny Hornsby; Mark Kennedy, Judge Mark Kennedy for Supreme Court, Friends of Judge Mark Kennedy.
[2] Although the lawsuit originally named all 21 Alabama television broadcasters that accepted political advertisements in 1990, claims against some have been dismissed. The defendants remaining in this action are: Cosmos Broadcasting Corporation a/k/a WSFA TV; Television Muscle Shoals, Inc. a/k/a WOWL TV; WKRG-TV, Inc.; Gliddens Holdings, Inc. f/k/a WKRG-TV, Inc.; Clear Channel Communications, Inc., a/k/a WPMI-TV f/k/a Clear Channel Television, Inc.; Alabama Telecasters, Inc. d/b/a WAKA — Channel 8 Montgomery; Montgomery Alabama Channel 32 Operating Limited Partnership, d/b/a WHOA-TV 32; Beacon Broadcasters, Ltd., a/k/a WCFT-TV; Burnham Broadcasting Corporation a/k/a WALA-TV; RKZ Television, Inc. a/k/a WJSU TV; Capstar Broadcasting a/k/a WJSU TV; Morris Network of Alabama, Inc. a/k/a WDHN-TV Channel 18; Smith Broadcasting, Inc. a/k/a WAAY-TV; The New York Times Broadcasting Service, Inc. a/k/a WHNT TV; Birmingham Television Corporation, Inc. a/k/a WBMG TV; M.G. Broadcasting of Birmingham, Inc., owner of WIAT-TV f/k/a WBMG TV; Citicasters Company f/k/a Great American Television and Radio Company, Inc. a/k/a WBRC TV; H R Broadcasting Corporation of Birmingham, Inc. a/k/a WTTO TV; Birmingham Broadcasting (WVTM-TV), Inc.; Relway Limited Partnership a/k/a WMPV TV n/k/a All American Television.
[3] 47 U.S.C. § 315(b) states:
"Broadcast media rates
 "The charges for the use of any broadcasting station by any person who is a legally qualified candidate for any public office in connection with his campaign for nomination for election, or election, to such office shall not exceed —
 "(1) during the forty-five days preceding the date of a primary or primary runoff election and during the sixty days preceding the date of a general or special election in which such person is a candidate, the lowest unit charge of the station for the same class and amount of time for the same period; and
 "(2) at any other time, the charges made for comparable use of such station by other users thereof."
[4] "Dependent" is defined as "determined or conditioned by another."Merriam Webster's Collegiate Dictionary 310 (10th ed. 1997).