Pursuant to § 6-5-642, Ala. Code 1975, State Farm Fire and Casualty Company appeals from an order of the DeKalb Circuit Court certifying, pursuant to Rule 23(b)(3), Ala. R. Civ. P., a nationwide class of policyholders of homeowners' insurance to pursue a class action against State Farm for alleged premium overcharges.
W.R. Evans, in his individual capacity and as representative of a putative class, sued State Farm on April 6, 2000, alleging that State Farm had discovered while it was conducting a dwelling reinspection program that approximately 700,000 dwellings were overinsured by State Farm and that, by the terms of the homeowners' policies, State Farm would be required to pay the homeowners only their replacement cost in case of loss rather than the coverage limit stated in the policies. Evans alleged that State Farm received unearned premium payments because he and other similarly situated policyholders paid premiums for coverage that did not attach and that exceeded State Farm's maximum obligation under the terms of the policies.
Evans sought class certification and asserted claims of money had and received, unjust enrichment, breach of fiduciary duty, fraudulent suppression, and negligence and wantonness. Evans sought compensatory damages, punitive damages, restitution, interest, and an attorney fee.
On May 31, 2000, State Farm moved the trial court to dismiss Evans's complaint or, in the alternative, for a summary judgment. On January 8, 2001, the trial court entered an order denying State Farm's motion as it pertained to Evans's claims of money had and received, unjust enrichment, and fraudulent suppression. The trial court granted State Farm's motion and dismissed Evans's claims of breach of fiduciary duty and negligence and wantonness.
On February 21, 2001, State Farm answered Evans's complaint and moved the trial court for a summary judgment as to the class allegations contained in Evans's complaint, arguing that the class allegations failed to satisfy the requirements of Rule 23, Ala. R. Civ. P. On March 29, 2001, the trial court entered an order postponing a hearing on State Farm's motion for a summary judgment as to the class allegations until after the parties had completed discovery. On August 2, 2002, State Farm submitted a supplemental brief in support of its motion for a summary judgment as to the class allegations, arguing that Evan's *Page 392 
claims are not appropriate for class certification and that the claims fail to satisfy the requirement of predominance.
Evans amended his complaint on August 9, 2002, to add a claim for injunctive relief and an equitable accounting. On August 13, 2002, Evans responded to State Farm's motion for a summary judgment as to the class allegations and abandoned his fraudulent-suppression claim. On August 19, 2002, Evans moved the trial court to certify a nationwide class pursuant to Rule 23(b)(2) and (b)(3), Ala. R. Civ. P. On September 3, 2002, the trial court entered an order denying State Farm's motion for a summary judgment as to the class allegations and set the class-certification issues for a hearing.
Following a hearing, the trial court, on January 30, 2003, entered an order finding that Evans had satisfied the threshold requirements for class certification pursuant to Rule 23(a), Ala. R. Civ. P. In addition, the trial court determined that class certification under Rule 23(b)(2) was not proper because the primary relief Evans sought was not injunctive or declaratory but was monetary in nature. The trial court concluded that class certification under Rule 23(b)(3) was proper and addressed the requirements of Rule 23(b)(3) as follows:
 "[Evans] also seeks class action certification under the provisions of Rule 23(b)(3), which are as follows:
 "`An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
 "`. . . .
 "`(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.'
 "The court has previously herein found that there is a common nucleus of facts satisfying the commonality requirement of Rule 23(a). The question now becomes whether the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and whether a class action is superior to other available methods for the fair and efficient adjudication of the controversy.
 "State Farm argues that the law of unjust enrichment and money had and received varies from state to state in a way that destroys the predominance of commonality as to the law. The court rejects this argument. The essence of the theories of unjust enrichment or money had and received as stated in Alabama law is that a plaintiff can prove facts showing that defendant holds money which in equity and good conscience, belongs to plaintiff or holds money which was improperly paid to defendant because of mistake or fraud. Dickinson v. Cosmos Broadcasting Co., 782 So.2d 260
(Ala. 2000). A survey of the law of other states shows that their laws on the subject of unjust enrichment and money had and received are the same or very similar to the law of Alabama, and the court finds that any slight variations *Page 393 
that may exist should not be destructive of class certification because such variations can be overcome at trial by grouping similar state laws together and applying them as a unit.
 "State Farm asserts that there are also significant issues of fact that are not common to all members of the class, and that such common issues of fact as may exist do not predominate. State Farm maintains that [Evans] must prove facts individual to each member of the putative class in order to prove his claim, and that in its defense of [Evans's] claim, it is entitled to prove facts individual to each member.
 "The court will examine first the elements that must be proved by [Evans] to sustain his claim. Applying the law of unjust enrichment and money had and received as stated above, [Evans] can sustain his claim by proving that State Farm holds money that was improperly paid to it because of mistake. This can be done in substantial part by proving from the records of State Farm that the reinspection program resulted in a finding by State Farm that the existing coverage of the putative class members was excessive. The fact that State Farm found the coverage to be excessive equates to an acknowledgment that it mistakenly insured the dwellings for more than replacement cost. No further proof of mistake would be required, and [Evans] would have no need to offer proof of mistake from individual members of the class.
 "Whether the premiums were improperly paid depends upon whether they were paid for coverage upon which State Farm bore no risk. Here, again, [Evans] has no need to offer evidence from individual members of the class. A reasonable inference that State Farm received premiums upon which it bore no risk can be drawn from State Farm's own determination that the higher coverage was excessive. The court finds that [Evans] can sustain his claim that State Farm holds money paid to it by mistake without proof from individual class members.
 "State Farm maintains that it is entitled to put forth a defense based on the individual facts relating to each member of the putative class. For example, State Farm submits that it should be able to show that the original coverage amount reflected a reasonable estimate of replacement cost, and that the recalculated replacement cost was inaccurately low. [Evans] argues, however, and the court agrees that State Farm is estopped from asserting a defense that impeaches the recalculated replacement cost. State Farm having made a determination through its reinspection program that a homeowner's coverage was excessive, and that the homeowner's peril did not justify such coverage, and having used this determination to reduce the coverage, it cannot now be permitted to retreat from this determination. `There is a kind of evidential estoppel which, though it may not amount to complete estoppel in pais, is raised when persons who have spoken or acted one way under one set of circumstances, and with one objective in mind, undertake under other circumstances and when their objective has changed, to testimonially give different color to what they formerly said and did.' Holly Hill Citrus Growers' Ass'n v. Holly Hill Fruit Products, Inc., 75 F.2d 13 (5th Cir.1935); In re Gilmore, 221 B.R. 864 (Bkrtcy. N.D.Ala.1998).
 "State Farm is not, however, precluded from proving by other means that it was in fact at risk for the higher coverage amount in spite of the reinspection finding that the coverage was excessive. *Page 394 
 It could, for example, prove that when a loss occurs, homeowner claims are frequently made based on contractor estimates for the full coverage amount and that these estimates are sometimes paid even though they exceed State Farm's assessment of the loss. It also could show that in making claim payment decisions, it recognizes that replacement cost estimates can vary based upon the individual performing the estimate and the method used. Such proof would not be individualized to each member of the putative class but would bear upon issues common to all.
 "State Farm insists that it is entitled to prove the interaction between each policyholder and State Farm's agent at the time the original coverage amount was determined for the purpose of showing that some policyholders requested the higher coverage. It is not a defense, however, that the policyholder requested the higher coverage because 1) such a request would be immaterial to whether State Farm received premiums for coverage upon which it bore no risk, and 2) such a request could not be used to rebut State Farm's own acknowledgment that the higher coverage amount was excessive and based upon a mistake.
 "The court finds that State Farm has suggested no defense which would entitle it to offer individualized proof from each member of the putative class.
 "State Farm also contends that damages would be impossible to assess on a uniform, class-wide basis. Without a doubt, the calculation of damages would be complicated and would require an individual calculation for each member of the class. The relief sought by [Evans] is not couched in terms of damages but instead he seeks an accounting, the imposition of a constructive trust, disgorgement of funds, and distribution of restitution to the members of the class. Whether the monetary relief is called damages or restitution, it is apparent that a determination of the amount due each member of the class would require an individual calculation. Such individualized calculation should not, however, defeat class certification in this case.
 "The necessary calculation is feasible, as evidenced by the fact that State Farm developed a policy for making refunds and by the further fact that State Farm calculated the amount of refund due to [Evans] after this litigation was commenced. Moreover, it is well settled that the need for individual examination on the issue of damages is not a bar to class certification. See Sterling v. Velsicol Chem. Corp., 855 F.2d 1188 (6th Cir.1988).
 "For the reasons set forth above, it is the court's finding that the questions of law and fact common to the members of the putative class predominate over any questions affecting only individual members, and that the predominance requirement of Rule 23(b)(3) is met.
 "The court's consideration of the other matters pertinent to the issue of superiority leads it to the following conclusions: a) members of the class would probably have little interest in prosecuting separate actions because of the substantial expense in doing so compared to the amount of individual claims; b) there is no other litigation concerning this controversy; c) there is no undesirable reason for concentrating the litigation in this particular forum; and d) there are no unusual difficulties likely to be encountered in the management of this litigation as a class action.
 "For the reasons stated, the court finds that a class action is superior to other available methods for the fair and *Page 395 
efficient adjudication of the controversy."
State Farm appeals.
 I. Standard of Review
We initially note that this Court reviews a trial court's class-certification order to determine whether the trial court exceeded its discretion in issuing the order, "`but we will review de novo the question whether the trial court applied the correct legal standard in reaching its decision to certify a class.'" Alfa Life Ins. Corp. v. Hughes,861 So.2d 1088, 1094 (Ala. 2003) (quoting Smart Prof I Photocopy Corp.v. Childers-Sims, 850 So.2d 1245, 1248 (Ala. 2002)). The party seeking certification has the burden of proving that it is entitled to class certification. § 6-5-641(e), Ala. Code 1975. Further,
 "an abuse of discretion in certifying a class action may be predicated upon a showing by the party seeking to have the class-certification order set aside that `the party seeking class action certification failed to carry the burden of producing sufficient evidence to satisfy the requirements of Rule 23.'"
Compass Bank v. Snow, 823 So.2d 667, 672 (Ala. 2001) (quoting Ex parte Green Tree Fin. Corp.,684 So.2d 1302, 1307 (Ala. 1996)).
 II. Facts
State Farm is in the business of providing homeowners' insurance on a nationwide basis. State Farm homeowners' insurance policies offer "Coverage A," which indemnifies a homeowner for the costs associated with replacing a dwelling in the event of a total loss.[2] Because it is difficult, before an actual loss has occurred, to determine the cost of replacing a dwelling, the replacement-cost coverage on an individual dwelling is necessarily an estimate. State Farm uses the "Boeckh" replacement-cost calculator to estimate the approximate replacement cost of the dwellings it insures with Coverage A. The Boeckh replacement-cost calculator is an estimating tool that combines certain factors such as type of construction; residence type; number of stories to the dwelling; square footage of the dwelling; wage rates in the area in which dwelling is located; and material prices in order to estimate the replacement cost. When the Boeckh calculator is used correctly, it produces an estimated replacement cost that is within plus or minus 10 percent of the actual replacement cost. However, certain factors such as local economic trends affecting demand[3] or interior upgrades to a dwelling[4] may affect the accuracy of the replacement cost arrived at using the Boeckh calculator. Additionally, State Farm annually applies an inflation index to the Coverage A amounts in order to protect *Page 396 
the policyholder from construction-cost inflation. The purpose of this inflation index is to keep pace with changes in local construction costs. The policyholder is apprised of the inflation index in the insurance policy and in renewal notices for the policy.
State Farm informs its policyholders that the replacement cost produced by the Boeckh calculator is just an estimate and that it is not a guarantee of what the replacement cost may actually turn out to be in case of a total loss. Policyholders are free to purchase coverage amounts above or below the estimate generated by the Boeckh calculator. It is State Farm's practice to agree, within reason, to a policyholder's request for coverage in an amount that is above or below the estimated cost generated by the Boeckh calculator. State Farm presented evidence indicating that some of the potential class members, including Evans, requested a coverage amount different from the replacement cost generated by the Boeckh calculator.
Between 1993 and 1996, State Farm implemented a company-wide three-year reinspection program of dwellings the coverages for which had originally been written before 1990. This reinspection program included a review of policies providing for the replacement cost of a dwelling ("Coverage A amounts"). State Farm believed that a significant amount of the dwellings it insured were underinsured by an average of 20%. The stated purpose of the reinspection program was to protect the policyholder by ensuring proper coverage in case of major loss and to ensure that the policyholders pay a premium commensurate with the value of their dwelling. State Farm estimated that the reinspection program could result in a premium gain in excess of $100 million, which would be compounded each year the business stayed on the books.
During the reinspection program, State Farm and its employees gathered the appropriate information necessary for the dwellings involved in the reinspection program, e.g., square footage, residence type, construction type, etc., and used the Boeckh calculator to calculate a new estimated replacement-cost figure. If during the reinspection a recalculated replacement-cost estimate differed from an existing Coverage A amount, the policyholder's agent would discuss with the policyholder whether the policyholder wanted to make a change in the Coverage A amount. As with the original estimated coverage amounts, it was State Farm's practice during the reinspection program to agree, within reason, to a policyholder's request for a recalculated coverage amount that differed from the estimated coverage amount generated by the Boeckh calculator.[5] State Farm reinspected over 6.3 million *Page 397 
dwellings during the reinspection program, and it increased the Coverage A amounts in over 2.2 million policies. State Farm also decreased the Coverage A amounts in approximately 700,000 policies.
State Farm maintains its homeowners' policy information on a Fire Master Record ("the FMR"). Information regarding the reinspection program was maintained by State Farm in the FMR. Information relating to a homeowner's policy is accessed from the FMR by using a policy data query ("PDQ"). A PDQ reflects the history of transactions relative to a particular policy. Because of the storage capacity of that system, State Farm keeps detailed policy premium information for only five years. Additionally, only the last 50 transactions relating to a policy are reflected in the PDQ history-transaction field. Once a policy has more than 50 transactions, the oldest transaction is dropped from the FMR. State Farm does not record the reasons for an increase or a decrease in the Coverage A amount in a policy.
Evans states that class members can be identified through the PDQ and that the PDQ will uniformly show the following with respect to each class member: (1) "Reinspection Agent," indicating that State Farm reinspected the insured's dwelling and calculated a replacement cost; (2) "Insurance to Value Change," indicating that the replacement cost of the dwelling differed from the original coverage amount and that the coverage amount had been changed; and (3) "Decrease Endorsement," indicating a decrease in the Coverage A amount. Evans concludes that State Farm's database contains the data necessary to calculate the total amount of the unearned premiums resulting from the reinspection program.
State Farm states that it would be impossible from its database to identify all policies that had had a decrease in Coverage A amounts as the result of recalculated replacement cost during the relevant period because: (1) State Farm maintains detailed information relating to premiums and coverages for only five years; (2) only the last 50 transactions relative to a policy are reflected in the PDQ history-transaction field and once a policy has had more than 50 transactions, the oldest transaction is dropped from the FMR; and (3) State Farm does not record the reason for a coverage change, whatever it may be.
State Farm does note two potential sources of information relating to decreases in Coverage A amounts between 1993 and 1996. Paul Kirchgasler, a fire-business analyst employed by State Farm, testified in his affidavit that the FMR has a "notes" field that allows, but does not require, a person making a change to a policy to enter comments regarding increases or decreases in Coverage A amounts. Kirchgasler states that it is possible that some comments were made regarding the decreases in Coverage A amounts between 1993 and 1996, but finding *Page 398 
any such comments would require a file-by-file review because there is no feasible way to perform a computer-assisted search for that information. Kirchgasler also testified that another possible source for the information would be State Farm's computer-assisted retrieval ("CAR") system, a document-imaging system that contains imaged and microfilmed documents. Kirchgasler states that it is possible that certain documents relating to decreases in Coverage A amounts may have been imaged or microfilmed, but like the comments or "notes" field mentioned above, there is no requirement or policy dictating that such a document be maintained. He states that documents contained in the CAR system cannot be effectively searched by computer to look for information regarding decreases in Coverage A amounts because all that is captured in the system is a picture of the document, and there is no way to search the contents of that document.
State Farm contends that there is no way to determine, except by way of individual testimony, whether pre-reduction coverage amounts differed in any material respect from either recalculated estimated replacement cost or decreased coverage amounts. For example State Farm points to a sample of decreases in Coverage A amounts made to policies by Evans's agent.[6]
Evans's agent reinspected a total of 427 dwellings of which 9, including Evans's dwelling, resulted in a decrease in Coverage A amounts. Five of those nine decreases were within 10 percent of the previous Coverage A amount. Additionally, eight of the nine policyholders had at some point during the term of the policy chosen a Coverage A amount that differed from the estimated replacement cost calculated by State Farm.[7]
State Farm initially issued Evans's homeowner's policy in December 1981. The Coverage A amount was calculated at that time to be $105,300; however, Evans chose a lesser coverage amount of $100,000. Evans renewed his homeowner's policy for the coverage year 1994-1995; the Coverage A amount was $139,800. The policy was due to be renewed for the 1995-1996 coverage year with a Coverage A amount of $143,300; however, the Coverage A amount was changed as a result of the reinspection program. The Coverage A amount had increased over the years because of the application of the inflation index as provided by the policy.
Evans's dwelling was reinspected in June 1995 as part of State Farm's reinspection program. Because an incorrect square-footage indicator was used, Evans's Coverage A amount was recalculated to be $100,800.[8] The Coverage A amount was recalculated using the correct square-footage indicator, which resulted in an estimated Coverage A amount of $136,600. The recalculated estimated Coverage A amount of $136,600 was within 10 percent of the $143,300 Coverage A amount that Evans's homeowner's policy would have been renewed for in December 1995 if the reinspection program had not been conducted. Nevertheless, Evans requested a significantly *Page 399 
lower coverage amount of $115,000, and at the same time changed the type of policy he had to one that would cover full replacement cost even if that cost exceeded $115,000.
Evans requested a refund of the premiums he had paid in years preceding the reinspection program for coverage in excess of the estimated replacement cost of his dwelling. State Farm refunded Evans $8,215.99, which represented excess premiums paid from December 1981 through December 1995, plus interest. Accompanying the refund check was a letter that stated in part:
 "This refund is being paid to you unconditionally pursuant to State Farm's voluntary refund procedure. This is an internal operating procedure, which exists separate and apart from your contract of insurance with State Farm, or any law, statute, rule or regulation which might apply to that policy of insurance. Under this procedure, State Farm may, subject to records availability, refund to its policyholders any premiums paid for coverage which appears to be in `excess' of the property's estimated replacement cost, where the `excess' coverage is due to a mistake. Because records on your policy are available through policy year 1981, the amount paid to represents a refund of these `excess' premiums with interest since the inception of the policy. . . .
 "This refund is not to be considered an admission of liability or any wrongdoing by State Farm or anyone else. To the contrary, State Farm continues to maintain that you have no legal entitlement to any refund. This policy was originally issued for the face amount you requested on your application and then renewed each year for a definite, specified premium, which was accepted by you. There certainly was no compulsion that you take this policy, or any subsequent renewal of the policy."
 III. Rule 23(b)(3) Criteria
In order to obtain class certification under Rule 23(b)(3), Ala. R. Civ. P., the plaintiff must establish the prerequisites of Rule 23(a), Ala. R. Civ. P., as well as those set forth in Rule 23(b)(3). Funliner of Alabama, L.L.C. v. Pickard,873 So.2d 198 (Ala. 2003). Rule 23(a) provides:
 "(a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."
Rule 23(b)(3) provides:
 "(b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
 ". . . .
 "(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating *Page 400 
the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action."
 A. Predominance
State Farm argues that the trial court erred in certifying Evans's claims of unjust enrichment and money had and received as a class action pursuant to Rule 23(b)(3), Ala. R. Civ. P., because, it says, numerous individual issues predominate that make the asserted claims unmanageable as a class action. This Court has stated:
 "`The predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.' Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). In considering whether questions of law or fact common to the class members predominate over questions applicable only to individual class members, a court must evaluate `what value the resolution of the class-wide issue will have in each class member's underlying cause of action.' Rutstein v. Avis Rent-A-Car Sys., Inc., 211 F.3d 1228, 1234 (11th Cir.2000). Courts examine the substantive law applicable to the claims and determine whether the plaintiffs presented sufficient proof that common questions of law or fact predominate over individual claims. See Ex parte Green Tree Fin. Corp., 723 So.2d 6 (Ala. 1998); Smart Prof'l Photocopy Corp. v. Childers-Sims, 850 So.2d 1245
(Ala. 2002)."
Voyager Ins. Cos. v. Whitson, 867 So.2d 1065, 1071
(Ala. 2003). Additionally, "the necessity of individualized testimony from each class member to prove an essential element of the cause of action defeats class certification."Smart Prof'l Photocopy Corp. v. Childers-Sims,850 So.2d at 1249. This Court has also stated:
 "[W]e have grave concerns as to whether any national class of plaintiffs in an action involving the application of the differing laws of numerous states can satisfy the requirements of showing that `the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.' Rule 23(b)(3)."
Ex parte Green Tree Fin. Corp., 723 So.2d 6, 11
(Ala. 1998).
Evans's claims of unjust enrichment and money had and received are based on contentions that State Farm received unearned premium payments because the members of the purported class paid premiums for coverage that did not attach and that were in excess of State Farm's maximum obligation under the terms of the members' policies. In order to prevail on claims of unjust enrichment and money had and received, "the plaintiffs must establish that the defendants hold money that, in equity and good conscience, belongs to the plaintiffs, or that the defendants hold money that was improperly paid to the defendants because of mistake or fraud." Funliner ofAlabama, 873 So.2d at 209. Here, the trial court evaluated the claims of unjust enrichment and money had and received on the basis that State Farm held money that was paid to it based on mistake.
In Smart Professional Photocopy, supra, the plaintiffs sued Smart Professional Photocopy ("Smart")[9]
asserting claims of *Page 401 
unjust enrichment, money paid by mistake, and money had and received. The plaintiffs alleged that they had mistakenly paid the amounts charged by Smart, which, they alleged, were in excess of the reasonable costs of reproducing medical records pursuant to § 12-21-6.1, Ala. Code 1975. Following a class-certification hearing, the trial court entered an order finding that common questions of law and fact predominated, and it certified two classes of individuals.[10]
In vacating the class-certification order and concluding that individual issues of fact predominated over the plaintiffs' claims, this Court stated the following:
 "In the present case, Smart has demonstrated that individualized evidence is required to determine whether each class member operated under a mistake of fact. Each class member had a copy of an invoice prepared by Smart, the actual copies of medical records, and the envelope showing the postage paid. Some members may have reviewed their invoices to determine whether the shipping and handling charge was excessive or whether the per-page charges were improper. Others may have analyzed whether Smart charged more for medical records or for billing records. We note that the customers' billings were received and paid in the first instance by the customers' legal counsel, thus making an additional line of inquiry as to the customers' knowledge of factual and legal matters in connection with the customers' claims. A trier of fact would have to determine whether each individual member of the class paid an invoice from Smart by mistake.
 "Similar to the extensive inquiry required in Compass Bank [v. Snow, 823 So.2d 667
(Ala. 2001),] the necessity of conducting such a detailed inquiry into more than 60,000 transactions among numerous class members renders the requirement of predominance impossible. We cannot assume that each class member paid the invoices based upon a mistake of fact. See Ex parte Green Tree Fin. Corp., 723 So.2d 6 (Ala. 1998) (vacating a class-certification order, in part, because of individualized proof of subjective factors).
 ". . . .
 "It is clear here . . . that individual inquiry will be required to determine what information, if any, each class member relied upon in paying the invoices for Smart's services. The customers have `contended from their initial filing, that payment was made by mistake and contend that they were not in possession of all of the facts necessary for determining how much to pay [Smart] for [its] copying and postage services.' Because of the necessity in this case of proving each class member's subjective state of mind, individual issues predominate over the customers' claims. The customers cannot prove that each member paid under the same mistake of fact nor can they determine the extent of each class member's knowledge upon payment of the invoice from Smart. Thus, the customers cannot satisfy their burden of proof as to each member's payment by mistake without individual inquiries. See Reynolds Metals [v. Hill, 825 So.2d 100 (Ala. 2002)]."
Smart Prof'l Photocopy, 850 So.2d at 1251 (emphasis added). See also Voyager Ins. Cos. v. Whitson,867 So.2d at 1075, vacating a Rule 23(b)(3) class-certification order because the plaintiffs' "unjust-enrichment *Page 402 
claims . . . [were] grounded in mistake of fact, and individual evidence would be required to prove mistake of fact."
The trial court stated the following in its certification order:
 "Applying the law of unjust enrichment and money had and received . . ., [Evans] can sustain his claim by proving that State Farm holds money that was improperly paid to it because of mistake. This can be done in substantial part by proving from the records of State Farm that the re-inspection program resulted in a finding by State Farm that the existing coverage of the putative class members was excessive. The fact that State Farm found the coverage to be excessive equates to an acknowledgment that it mistakenly insured the dwellings for more than replacement cost. No further proof of mistake would be required, and [Evans] would have no need to offer proof of mistake from individual members of the class."
(Emphasis added.) The trial court's order impermissibly assumes that each reduction in a Coverage A amount during the reinspection period represented a finding by State Farm that the pre-reduction coverage amount had been excessive and, therefore, a finding that it had mistakenly insured the dwellings for more than replacement cost. The evidence presented indicated that State Farm does not record the reasons for decreases in Coverage A amounts. For the trial court to conclude that all 700,000 decreases in coverage amounts were based on findings by State Farm that the existing coverages were excessive requires it to assume a mistake on the part of State Farm, a practice expressly forbidden by this Court inSmart Professional Photocopy, supra. In order to determine whether a policyholder's pre-reduction coverage amount was in fact excessive would require an inquiry into each and every transaction that resulted in a reduction in the Coverage A amount. Therefore, because individual inquiries would be required to establish mistake, such individualized inquiries predominate, precluding class certification.
The trial court's order also fails to take into consideration an affirmative decision by a policyholder to choose to decrease his Coverage A amount. A policyholder could have chosen to decrease his Coverage A amount because he perceived his prior Coverage A amount to be too high. For example, a policyholder could have requested a reduction in coverage because of strained financial circumstances, because of a decrease in the balance he owed on the dwelling, or simply because he changed his mind about the reasons he wanted a higher Coverage A amount. Again, individual inquiries would be required to establish a mistake on the part of State Farm, and such individualized inquiries predominate, thereby precluding class certification.
Evans contends in his brief that the PDQ field of the FMR will uniformly show the following with respect to each class member: (1) "Reinspection Agent," indicating that State Farm had reinspected the insured's dwelling and had calculated a replacement cost; (2) "Insurance to Value Change," indicating that the replacement cost of the dwelling as calculated as a result of the reinspection program differed from the coverage amount and had been changed; and (3) "Decrease Endorsement," indicating a decrease in the Coverage A amount. However, this information establishes only that a decrease in Coverage A amount occurred. It does not establish that the pre-reduction coverage was determined by State Farm to be excessive; any such determination would require an assumption that, as discussed above, is prohibited. Additionally, State *Page 403 
Farm presented evidence regarding other potential sources of information relating to decreases in Coverage A amounts. However, the evidence indicated that it is not feasible to perform a computerized search for this information and that it would require a file-by-file search or an individual inquiry, which acts to defeat class certification in unjust-enrichment and money-had-and-received cases. Voyager Insurance,supra.
The evidence presented indicated only that reductions in Coverage A amounts had occurred during the reinspection program. The trial court's determination that pre-reduction coverage amounts were excessive, which resulted in the policyholders' mistakenly paying for coverage in excess of replacement cost, resulted from an impermissible assumption by the trial court and could be determined only by individual inquiries, both of which defeat class certification of the unjust-enrichment and money-had-and-received claims. Accordingly, we conclude that individual issues of payment by mistake predominate over the claims presented and that Evans and the other policyholders have failed to meet their burden of proof.
 B. Superiority
"When individual issues predominate over the common claims, manageability of the action as a class is not possible."Voyager Insurance, 867 So.2d at 1077. Accordingly, because individual issues of payment by mistake predominate over the common claims in this case, Evans and the other policyholders have failed to establish the superiority requirements of Rule 23(b)(3).
 IV. Conclusion
Because we have concluded that Evans and the other policyholders have failed to establish the predominance and superiority requirements of Rule 23(b)(3), we pretermit a discussion of the remaining issues raised by State Farm. We vacate the class-certification order entered by the trial court and remand the cause for further proceedings consistent with this opinion.
ORDER VACATED; CAUSE REMANDED.
NABERS, C.J., and SEE, LYONS, HARWOOD, STUART, SMITH, and PARKER, JJ., concur.
[2] In "valued policy" states, the insurer is required by law to pay the entire coverage amount for a total loss regardless of the replacement cost of the dwelling. The class proposed here deals with only those putative class members who had "Coverage A" or replacement-cost coverage.
[3] For example, if demand for new houses is down, a contractor may accept less profit to be able to keep construction crews working, whereas in a period of increased demand the contractor may include more than the normal overhead and profit in a project.
[4] For example, the Boeckh calculator could generate approximately the same replacement-cost estimate for two dwellings based on such factors as square footage and exterior construction; however, one dwelling may have significant interior upgrades, i.e., trim molding, flooring, etc., which would cause the replacement cost of that dwelling to be significantly more than the dwelling without the upgrades.
[5] State Farm established a voluntary refund policy during the reinspection program. State Farm would refund premiums in cases where the coverage amount before the reinspection program was significantly higher than the recalculated coverage amount. State Farm's internal refund policy states:
 "There are cases of overinsurance that need response. Our recommended procedure to handle the problems are broken down into two issues[:]
 "[I] Situations involving overinsurance not related to mortgagee requirements.
 "This category would include mistakes made by the company and by agents. This would include, for example, significant mistakes of measurement and/or classification. Generally, that would be where the measurements were off by more than 10-15% and/or more than one classification category, i.e., classed as deluxe where standard was the appropriate category.
 "The procedure for handling overinsurance is:
 "[1.] We should refund the entire amount of the premium overcharged for as far back as our records allow to detect the time of error[;]
 "[2.] Interest is to be paid in these situations[.]
 ". . . .
 "[II.] Situations of overinsurance relating to mortgagee requirements.
 "Where the property has been potentially overinsured due to a mortgagee requirement, we do not believe we have an obligation to refund monies. The continuing Reinspection Program will provide an opportunity for consultation between agent and policyholder. In most cases, a satisfactory agreement on values can be worked out. In those isolated cases where it appears the mortgagee is still an issue, the matter should be resolved between the insured and the mortgagee with little intervention from us."
[6] Evans's agent apparently kept hard copies of his clients' files concerning coverage reductions during the reinspection program.
[7] The remaining policy failed to contain sufficient information or documentation to determine whether the policyholder had requested a different coverage amount from the estimated replacement cost calculated by State Farm.
[8] The correct square-footage indicator was 1,770 square feet; however, a square-footage indicator of 1,180 square feet was inadvertently used when the Coverage A amount was recalculated.
[9] Smart was in the business of providing copying and other services to healthcare businesses.
[10] Two classes were certified because of the types of records requested by the plaintiffs and the amount Smart charged each plaintiff for its services.