REL:09/30/2014

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0649), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## SPECIAL TERM, 2014

_____

## 1121462

_____

**Ex parte L.J.**

PETITION FOR WRIT OF CERTIORARI
TO THE COURT OF CIVIL APPEALS

(In re: C.C.

v.

L.J.)

(Limestone Juvenile Court, JU-12-154.01;
Court of Civil Appeals, 2120534)

PER CURIAM.

1121462

This Court granted certiorari review to address the issue whether a juvenile court may exercise jurisdiction under § 12-15-114, Ala. Code 1975, a provision of the Alabama Juvenile Justice Act of 2008, § 12-15-101 et seq., Ala. Code 1975 ("the 2008 AJJA"), over a termination-of-parental-rights claim when the grounds for the termination do not involve a child alleged "to have committed a delinquent act, to be dependent, or to be in need of supervision."

<u>Facts and Procedural History</u>

In July 2012, L.J. ("the mother") filed a petition in the Limestone Juvenile Court to establish paternity of the child at issue in this case. In that same petition, the mother also sought to terminate the parental rights of C.C. ("the father"). In the petition, the mother stated that the father had previously filed an action in the circuit court and that that court had ordered a DNA test that established the father's paternity but that the father had withdrawn the petition before the court had issued an order establishing paternity. In her petition, the mother alleged that the father had abandoned the child.

The father, initially acting pro se, filed an answer generally denying the allegations in the mother's petition, except for the paternity of the child. Because the issue was not in dispute, the juvenile court entered an order determining that the father was the biological father of the child. The father, acting through counsel, filed an amended answer and a counterclaim seeking joint legal custody of the child, with physical custody awarded to the mother; visitation rights; and establishing child support pursuant to Rule 32, Ala. R. Jud. Admin.

Following ore tenus proceedings, at which the mother, the father, and the mother's mother testified, the juvenile court entered an order finding that the father had "abandoned" the child as that term is defined in § 12-15-301, Ala. Code 1975, and by § 12-15-319, Ala. Code 1975. The juvenile court terminated the father's parental rights, implicitly denying the father's counterclaim. The father timely appealed to the Court of Civil Appeals. The juvenile court certified the record as adequate for an appeal pursuant to Rule 28(A)(1)(a), Ala. R. Juv. P.

1121462

A majority of the Court of Civil Appeals held that, under § 12-15-114, the juvenile court lacked jurisdiction over a termination-of-parental-rights claim except insofar as that claim arises out of a proceeding involving an allegation that the child as to whom parental rights are being terminated is dependent, delinquent, or in need of supervision. C.C. v. L.J., [Ms. 2120534, September 6, 2013] ___ So. 3d ___ (Ala. Civ. App. 2013). Because the mother's petition for the termination of the father's parental rights did not arise out of a dependency, delinquency, or child-in-need-of-supervision proceeding, the Court of Civil Appeals held that the juvenile court lacked subject-matter jurisdiction and that its judgment was void. Specifically, the Court of Civil Appeals held that when the legislature repealed what was § 12-15-30(b), Ala. Code 1975, removing language giving juvenile courts exclusive jurisdiction over all termination-of-parental-rights proceedings and replacing it with more limited jurisdiction over only certain types of termination-of-parental-rights proceedings (i.e., those arising out of dependency, delinquency, or child-in-need-of-supervision proceedings), the legislature intended to narrow the juvenile court's

4

1121462

jurisdiction in termination-of-parental-rights cases. Because the mother, who was the legal custodian of the child, had not alleged that the child was dependent, i.e., without a parent willing to provide for the care, support, or education of the child, the Court of Civil Appeals concluded that the juvenile court lacked jurisdiction over her petition. The Court of Civil Appeals dismissed the appeal as being from a void judgment.

Two members of the Court of Civil Appeals dissented, opining that the enactment of the 2008 AJJA did not alter the formerly prevailing law under which a parent could seek to terminate the parental rights of the other parent in the juvenile court. C.C. v. L.J., ___ So. 3d at ____ (Pittman, J., dissenting, with Thompson, P.J., joining).  The dissent notes that former § 26-18-5, Ala. Code 1975, a provision of the Child Protection Act ("the CPA"), which was amended and carried forward in the 2008 AJJA as § 12-15-317, Ala. Code 1975, now provides that "'any ... parent... may file a petition to terminate the parental rights of a parent or parents of a child,'" ___ So. 3d at ___, and that, although the proper forum is not set out in § 12-15-317, the remaining

5

1121462

sections of the 2008 AJJA evidence an intent by the legislature to provide the juvenile court with jurisdiction over termination-of-parental-rights proceedings filed by a parent seeking to terminate the rights of the other parent. The dissent states:

> "Did the enactment of the [2008] AJJA alter the formerly prevailing law under which parents could seek termination of parental rights in the juvenile court? Former § 26-18-5 has been carried forward into the [2008] AJJA and codified at Ala. Code 1975, § 12-15-317, which states that 'any ... parent ... may file a petition to terminate the parental rights of a parent or parents of a child.' Although the proper forum for filing such a petition is not therein stated, the Code sections that follow leave no doubt that the legislature intended that juvenile courts maintain their former exclusive jurisdiction to hear such matters. Taken together, the succeeding sections of the [2008] AJJA provide (a) for service of process by publication to be ordered in particular circumstances by the juvenile court (§ 12-15-318), (b) that termination of parental rights may be ordered by the juvenile court upon a proper showing of grounds therefor (§ 12-15-319), and (c) that additional actions are authorized to be undertaken by the juvenile court upon a determination that parents are unwilling or unable to act as parents (§ 12-15-320). I glean from the [2008] AJJA's repetitious references to the juvenile court in connection with disposition of cases in which termination of parental rights is sought, including cases in which a parent seeks such termination, that the legislature had no intent to deprive the juvenile court of its former exclusive jurisdiction to adjudicate a termination-of-parental-rights claim such as that advanced by the mother in this case."

6

1121462

___ So. 3d at ___ (Pittman, J., dissenting). The mother petitioned this Court for a writ of certiorari. We reverse and remand.

Discussion

The 2008 AJJA, which became effective January 1, 2009, revised and reorganized the CPA, § 26-18-1 et seq., Ala. Code 1975. The CPA governed cases involving the termination of parental rights. The 2008 AJJA also revised and renumbered an earlier version of the Juvenile Justice Act. Former § 12-15-30(b)(2), for example, has been revised and is currently set out in § 12-15-115(a)(1) and (a)(2), Ala. Code 1975. Essentially, the 2008 AJJA merged the CPA and the former Juvenile Justice Act.

Under the former Juvenile Justice Act, § 12-15-30(a) provided that the juvenile court had exclusive original jurisdiction over proceedings in which a child was alleged to be dependent, delinquent, or in need of supervision. Former § 12-15-30(b)(6) further provided that the juvenile court also had exclusive original jurisdiction over proceedings for the "termination of parental rights."

7

The CPA was enacted "to provided meaningful guidelines to be used by the juvenile court in cases involving the termination of parental rights." § 26-18-2 (repealed). Under the CPA, § 26-18-5 set out who could file a petition to terminate parental rights: "A petition may be filed by any public or private licensed child-placing agency or parent, with permission of the court, or any interested party." § 26-18-5 (repealed). The CPA was the first time the legislature had allowed a parent to initiate such an action. In Ex parte Johnson, 474 So. 2d 715 (Ala. 1985), this Court held that former § 26-18-5 evidenced a legislative intent to allow a parent to initiate a termination petition:

> "[T]here is no logical reason to allow only the state to file a petition to have parental rights terminated. Why should a parent, who has direct knowledge and familiarity with a situation, be required to go to the state to obtain such a result, when it would be more direct for the parent to file the petition?"

474 So. 2d at 717.

Under the CPA, a finding of dependency was not required when one parent sought to terminate the parental rights of another parent. In Ex parte Beasley, 564 So. 2d 950, 954 (Ala. 1990), we stated:

8

1121462

"[W]hen one parent seeks to terminate the other parent's parental rights, a 'finding of dependency' is not required. As stated above, if a 'finding of dependency' were a requisite element of proof, the following illogical result could arise: The petitioning parent, who is adequately caring for the child, would have to prove that he or she is not providing adequate care for the child and, therefore, could then be estopped from bringing such an action. We hold, therefore, that, when one parent seeks to terminate the other parent's parental rights, a 'finding of dependency' is not required, and the trial court should determine whether the petitioner has met the statutory burden of proof and whether that termination is in the child's best interest, in light of the surrounding circumstances.

"The two-prong test that a court must apply in a parental rights termination case brought by a custodial parent consists of the following: First, the court must find that there are grounds for the termination of parental rights, including, but not limited to, those specifically set forth in § 26-18-7 [now repealed]. Second, after the court has found that there exist grounds to order the termination of parental rights, the court must inquire as to whether all viable alternatives to a termination of parental rights have been considered."

In 2008, when the legislature merged the former Juvenile Justice Act with the CPA and revised and renumbered both in the 2008 AJJA, the legislature set out the juvenile court's jurisdiction in §§ 12-15-114, 12-15-115, and 12-15-116, Ala. Code 1975.

9

1121462

Section 12-15-115(a) provides that the juvenile court shall have original jurisdiction in certain civil cases, such as cases involving (1) the removal of disabilities of nonage, (2) judicial consent to marry, (3) commitments, (4) transfers from the probate court in adoption cases, (5) waivers of parental consent in abortion cases, (6) paternity, (7) modification of support, custody, or visitation in previously filed parentage cases, (8) enforcement of spousal support, (9) proceedings under the Uniform Child Custody Jurisdiction and Enforcement Act, and (10) grandparent visitation, when it is part of a juvenile case. Section 12-15-115(b) provides that the juvenile court will have original jurisdiction when emergency medical treatment is necessary and when the child has been suspended or expelled from a public school. Section 12-15-115 is a revision and renumbering of former §§ 12-15-30(b)(1), (b)(2), (b)(5), and 12-15-30(c). Section 12-15-116 is a revision and renumbering of former § 12-15-31 and addresses the juvenile court's original jurisdiction in criminal cases involving juveniles.

Section 12-15-114 is the provision of the 2008 AJJA that is before us in the present case; it is a revision and

10

1121462

renumbering of former § 12-15-30(b)(6). Section 12-15-114

provides:

"(a) A juvenile court shall exercise exclusive original jurisdiction of juvenile court proceedings in which a child is alleged to have committed a delinquent act, to be dependent, or to be in need of supervision. A dependency action shall not include a custody dispute between parents. Juvenile cases before the juvenile court shall be initiated through the juvenile court intake office pursuant to this chapter.

"(b) A juvenile court shall not have jurisdiction over any delinquent act committed by an individual before his or her 18th birthday for which a petition has not been filed before the individual reaches 21 years of age, except when the delinquent act is an offense having no statute of limitation as provided in Section 15-3-5[, Ala. Code 1975].

"(c) A juvenile court shall also exercise exclusive original jurisdiction of proceedings arising out of the above juvenile court proceedings, including, but not limited to, each of the following:

"(1) Proceedings pursuant to the Interstate Compact on Juveniles and the Interstate Compact on Placement of Children pursuant to Chapter 2 of Title 44.

"(2) Proceedings for termination of parental rights, as this term is defined in subdivision (10) of Section 12-15-301[, Ala. Code 1975]."[1]

_____

[1]As the result of an amendment effective October 1, 2010, § 12-15-301(10) now defines the term "reasonable efforts," which refers to efforts to preserve a family unit. It does not

11

1121462

We now turn to whether a juvenile court may exercise jurisdiction under § 12-15-114 over a termination-of-parental-rights petition when the ground for seeking the termination dose not involve a child alleged "to have committed a delinquent act, to be dependent, or to be in need of supervision."

Section 12-15-114(a) grants the juvenile court exclusive original jurisdiction over juvenile proceedings where the child is alleged to be dependent, delinquent, or in need of supervision. Section 12-15-114(a) states that "a dependency action shall not include a custody dispute between parents." Section 12-15-114(c) goes on to provide that the juvenile court shall also have exclusive original jurisdiction over proceedings "arising out of the above juvenile court proceedings," i.e., dependency, delinquency, and child-in-need-of-supervision proceedings, as set out in subsection (a). Former § 12-15-30(b)(6) gave the juvenile court jurisdiction over all termination-of-parental-rights proceedings.

---

refer to termination proceedings, which is now defined in § 12-15-301(14). Section 12-15-301(14) defines termination of parental rights as "[a] severance of all rights of a parent to a child."

12

1121462

Construing the language in § 12-15-114, the Court of Civil Appeals concluded that the legislature had limited the juvenile court's jurisdiction in termination-of-parental-rights proceedings to those cases "arising out of" dependency, delinquency, and child-in-need-of-supervision cases. Because the mother did not allege that the child was dependent, i.e., without a fit parent to provide care, the Court of Civil Appeals held that she, as a custodial parent, could not seek termination of the other parent's parental rights in the juvenile court.

> "We note that '[t]he intent of the Legislature is the polestar of statutory construction.' Siegelman v. Alabama Ass'n of School Bds., 819 So. 2d 568, 579 (Ala. 2001). See also Richardson v. PSB Armor, Inc., 682 So. 2d 438, 440 (Ala. 1996); Jones v. Conradi, 673 So. 2d 389, 394 (Ala. 1995); Ex parte Jordan, 592 So. 2d 579, 581 (Ala. 1992). '[T]he starting point for all statutory interpretation is the language of the statute itself,' and '[i]f the statutory language is clear, no further inquiry is appropriate.' Federal Reserve Bank of Atlanta v. Thomas, 220 F.3d 1235, 1239 (11th Cir. 2000). 'If the statutory language is ambiguous, however, courts may examine extrinsic materials, including legislative history, to determine [legislative] intent.' Id. It is also true that '[i]n attempting to ascertain the legislative intent of a particular statute or provision therein, it is permissible to look to the law as it existed prior to such statute's enactment.' Reeder v. State ex rel. Myers, 294 Ala. 260, 265, 314 So. 2d 853, 857 (1975). In that connection, 'courts [also] consider contemporaneous events surrounding enactment of the

13

statute.' <u>Baylor v. New Jersey Dep't of Human Servs.,</u> <u>Div. of Pub. Welfare</u>, 235 N.J. Super. 22, 41, 561 A.2d 618, 628 (1989), aff'd, 127 N.J. 286, 604 A.2d 110 (1990)."

<u>Pinigis v. Regions Bank</u>, 977 So. 2d 446, 450-51 (Ala. 2007).

In <u>Archer Daniels Midland Co. v. Seven Up Bottling Co. of</u> <u>Jasper, Inc.</u>, 746 So. 2d 966, 969 (Ala. 1999), this Court stated: "[W]hen circumstances surrounding the enactment of a statute cast doubt on the otherwise clear language of the statute, we must look to other factors in determining legislative intent." This Court further stated in <u>Archer</u> <u>Daniels</u>:

"As the plaintiff correctly points out, § 6-5-60[, Ala. Code 1975,] is not, on its face, limited to transactions involving intrastate commerce. We hasten to add, however, that there is no language in § 6-5-60 that conclusively indicates an intent on the Legislature's part to regulate transactions involving the shipment of goods through interstate commerce. Because the language of § 6-5-60, standing alone, is not conclusive on the question of legislative intent, and because other factors, including the legislative history of Alabama's antitrust statutes, as well as the state of the law at the time of their enactment, cast doubt on the original intent of the Legislature, we find it necessary to look beyond the language of the statute."

746 So. 2d at 973.

The foregoing rationale applies to this Court's determination of legislative intent with respect to § 12-15-

14

1121462

114. As our earlier discussion of the history of the 2008 AJJA indicates, it was well settled prior to the enactment of the 2008 AJJA that juvenile courts had exclusive original jurisdiction over all termination-of-parental-rights petitions. This included a petition filed by a parent seeking to terminate the parental rights of the other parent of the child, based on our decision in Ex parte Beasley in which we held that a finding of dependency was not required in such a case. We stated in Beasley that it would be illogical for a parent, who is adequately caring for the child, to have to prove that he or she is not providing adequate care (i.e., that the child is dependent) in order to bring such an action, because the petitioning parent would then be estopped from bringing the action. In light of the history of the 2008 AJJA, if the legislature had intended for the circuit court, as a court of general jurisdiction, to now have jurisdiction over termination petitions filed by one parent against the other parent, it would not have done so by legislative silence. Additionally, it is unlikely that the legislature would place jurisdiction over termination petitions in two different courts.

15

It is also unlikely that the legislature, in providing that the juvenile court has jurisdiction of termination petitions arising out of dependency, delinquency, or child-in-need-of-supervision proceedings intended to prohibit one parent from filing a petition seeking to terminate the parental rights of the other parent. As Judge Pittman noted in his dissent in C.C. v. L.J., the legislature, in adopting the entirety of the 2008 AJJA, provided that a parent may bring a petition to terminate the parental rights of the other parent of the child. § 12-15-317. If the legislature intended to foreclose a parent from bringing a termination petition by first requiring an allegation of dependency, it would not have also provided for the right to bring such a termination petition in the 2008 AJJA.

It is also unlikely that the legislature intended to foreclose a parent from filing a termination petition against another parent, but then to allow a parent to file a termination petition against the other parent when a stepparent wants to adopt the child. In S.N.W. v. M.D.F.H., 127 So. 3d 1225 (Ala. Civ. App. 2013), the stepfather of the child filed a petition in the probate court seeking to adopt

16

the child. After the case was transferred to the juvenile court, the mother filed a petition to terminate the biological father's parental rights in order for the stepfather to adopt the child. The father argued that the juvenile court lacked subject-matter jurisdiction under § 12-15-114 to terminate his parental rights because the underlying action did not begin as a dependency, delinquency, or child-in-need-of-supervision proceeding. Without referring to § 12-15-115(a)(4), which provides the juvenile court with original jurisdiction over proceedings transferred from the probate court, the Court of Civil Appeals held that § 26-10A-3, Ala. Code 1975, a provision of the Alabama Adoption Code, provides that the probate court has jurisdiction over adoption proceedings and that it has jurisdiction to transfer a case to the juvenile court for the limited purpose of terminating parental rights. The Court of Civil Appeals held that because § 26-10A-3 does not mandate that the termination-of-parental-rights proceeding be predicated on a dependency proceeding or a finding of dependency, the juvenile court had jurisdiction to entertain the mother's petition to terminate the father's parental rights so as to allow the stepfather to adopt the child. We

see no reason for the legislature to have provided that a parent be allowed to terminate the parental rights of the other parent simply because a stepparent adoption is involved, but not allow a parent to bring a termination proceeding when there is no pending stepparent adoption.

It is unlikely that the legislature intended for a noncustodial parent to able to bring a termination petition against the custodial parent while not allowing a custodial parent to bring such a petition. In T.K. v. M.G., 82 So. 3d 1 (Ala. Civ. App. 2011), a majority of the Court of Civil Appeals held that a father, who was not the custodial parent, could bring a dependency petition against the custodial mother invoking the jurisdiction of the juvenile court under § 12-15-114. The Court of Civil Appeals concluded that for the purpose of jurisdiction of the juvenile court, having a fit noncustodial parent who is willing and able to care for the child does not preclude a juvenile court from finding that the child is dependent. It does not follow that the legislature would prohibit a custodial parent from filing a termination petition while allowing a noncustodial parent to do so. The 2008 AJJA defines a "dependent child" to include a child who

18

1121462

"is in need of care or supervision" and "[w]ho is without a parent, legal guardian, or legal custodian willing and able to provide for the care, support, or education of the child." § 12-15-102(8)a.2., Ala. Code 1975. So long as the parent is fit, it should make no difference whether that parent currently has custody.

We note that, in the present case, the mother filed a petition in the juvenile court seeking to determine paternity of the child. Section 12-15-115(a)(6) provides that the juvenile court has original jurisdiction over petitions to establish parentage pursuant to the Alabama Uniform Parentage Act, § 26-17-1 et seq., Ala. Code 1975. Section 12-15-317 of the 2008 AJJA allows a parent to file a petition to terminate parental rights, and § 12-15-319 sets out the grounds for termination, which include abandonment, which the mother alleges here. If the juvenile court had jurisdiction over the paternity petition under § 12-15-115 and § 12-15-317 allows a parent to file a petition to terminate the parental rights of the other parent, then the juvenile court should have jurisdiction to address the mother's termination petition

19

without a finding of dependency. See S.N.W. v. M.D.F.H., supra.

While this appeal was pending, the legislature adopted Act No. 2014-350, Ala. Acts 2014, which amended § 12-15-114 to read as follows:

"(c) A juvenile court shall also exercise exclusive jurisdiction over each of the following:

"....

"(2) Proceedings for termination of parental rights."

In enacting Act No. 2014-350, the legislature stated:

"Section 2. The Legislature finds that its original intent in the adoption of Act 2008-277, the Alabama Juvenile Justice Act, was for a juvenile court to exercise exclusive original jurisdiction in all termination of parental rights proceedings. The amendatory language to Section 12-15-114, Code of Alabama 1975, provided in Section 1, is intended to be curative and shall apply retroactively for the purpose of ratifying and confirming the exercise of original jurisdiction of the juvenile court to hear and adjudicate termination of parental rights cases filed in juvenile court on and after January 1, 2009, and prior to the effective date of this act [April 8, 2014]. Any order of a juvenile court issued while exercising jurisdiction pursuant to this section during that time shall be deemed valid in absence of an adjudication on appeal to the contrary.

"Section 3. The provisions of this act are severable. If any part of this act is declared invalid or unconstitutional, that declaration shall not affect the part which remains.

20

1121462

> "Section 4. This act shall become effective immediately following its passage and approval by the Governor, or its otherwise becoming law."

The 2014 amendments to § 12-15-114 bear out the legislature's intent to not change the juvenile court's jurisdiction over all termination-of-parental-rights cases.

> "'When statutes are amended or replaced by succeeding legislation, the Legislature often seeks to clarify previously ambiguous provisions. These subsequent acts by the Legislature must be considered in trying to determine the intent of the legislation. 73 Am.Jur.2d, Statutes, § 178.' McWhorter v. State Bd. of Registration for Prof'l Eng'rs & Land Surveyors, 359 So. 2d 769, 773 (Ala. 1978)."

T-Mobile South, LLC v. Bonet, 85 So. 3d 963, 979 (Ala. 2011).

Based on the foregoing, we conclude that a juvenile court may exercise jurisdiction under § 12-15-114 over a termination-of-parental-rights claim when the subject of the termination was not a child alleged "to have committed a delinquent act, to be dependent, or to be in need of supervision." As Judge Pittman noted in his dissent, the 2008 AJJA did not alter the formerly prevailing law under which a parent could seek termination of parental rights in the juvenile court. Moreover, the legislature clearly expressed its intent in its 2014 amendments that under the 2008 AJJA the

21

1121462

juvenile court have exclusive original jurisdiction over all termination-of-parental-rights proceedings. Accordingly, we reverse the judgment of the Court of Civil Appeals and remand the cause for that court to consider any arguments that may have been pretermitted by the Court of Civil Appeals' analysis.

REVERSED AND REMANDED.

Moore, C.J., and Parker, Main, Wise, and Bryan, JJ., concur.

Stuart and Murdock, JJ., concur specially.

Bolin and Shaw, JJ., concur in the result.

1121462

MURDOCK, Justice (concurring specially).

I concur in the main opinion. I write separately to offer three observations.

First, the language of § 12-15-114, Ala. Code 1975, adopted by the legislature in the 2008 amendments to the Alabama Juvenile Justice Act affirmatively recognizes jurisdiction in the juvenile courts in dependency cases and two other categories of cases; it does not expressly limit the jurisdiction of juvenile courts to those categories. Normally, the latter fact would be of little or no significance, given that the juvenile court is a court of limited jurisdiction and is dependent for its authority upon legislative enactment. In this unique case, however, the latter fact is noteworthy in light of (1) the fact that the language in the succeeding provisions of the Alabama Juvenile Justice Act contemplates, as discussed in the main opinion and in Judge Pittman's dissenting opinion in the Court of Civil Appeals, that all termination petitions, including those filed by one parent against the other, will be prosecuted in the juvenile courts, (2) the fact that it was well settled at the time of the enactment of the 2008 amendments to the Alabama

23

1121462

Juvenile Justice Act that juvenile courts had exclusive original jurisdiction over all termination-of-parental-rights cases, (3) the fact that a showing of dependency is unnecessary and "illogical" in termination-of-parental-rights cases brought by one parent against the other, Ex parte Beasley, 564 So. 2d 950 (Ala. 1994), and (4) the fact that "'"[t]he Legislature is presumed to be aware of existing law and judicial interpretation when it adopts a statute."'" See Wright v. Childree, 972 So. 2d 771, 778 (Ala. 2006) (quoting Ex parte Louisville & Nashville R.R., 398 So. 2d 291, 296 (Ala. 1981)). Given these circumstances, if the legislature had in fact intended in 2008 to move jurisdiction over some, but not all, types of termination-of-parental-rights cases from the juvenile courts to the circuit courts, one would expect it to have been more explicit in saying so rather than purposing to achieve such a significant result by silence and default, relying merely on the fact that § 142(b) of the Alabama Constitution of 1901 makes the circuit court the court of general jurisdiction.

Second, I read the discussion in the main opinion of T.K. v. M.G., 82 So. 3d 1 (Ala. Civ. App. 2011), as one intended

24

merely to point out the inconsistency between the result achieved by the Court of Civil Appeals in that case and the result achieved by the Court of Civil Appeals in the present case; I do not read the main opinion as embracing the rationale of the Court of Civil Appeals in T.K.

Indeed, the main opinion concludes its discussion of T.K. by noting that, by statutory definition, a "'dependent child'" is one "who 'is in need of care or supervision' and '[w]ho is without a parent, legal guardian, or legal custodian willing and able to provide for the care, support, or education of the child.'" ___ So. 3d at ___ (quoting § 12-15-102(8)a.2., Ala. Code 1975) (emphasis added). The main opinion then adds: "So long as the parent is fit, it should make no difference `whether that parent currently has custody." ___ So. 3d at ___. That is, it should make no difference if the petitioning parent is the custodial parent or the noncustodial parent. If the petitioner, in  light of all the relevant facts and circumstances, is a fit, willing, and able parent in relation to the child in question, then the child by definition is not a "dependent" child.[2]

_____

[2]In T.K., however, the Court of Civil Appeals found the child to be "dependent," notwithstanding the fact that there

25

1121462

It was this notion -- that a child cannot be considered to be "dependent" on the State for care so long as the child has at least one "fit, willing, and able" parent —- that was the basis for this Court's holding in <u>Beasley</u> that requiring a showing of dependency in a termination-of-parental-rights case brought by one parent against the other, at least where the petitioning parent is alleged to be a fit, willing, and able parent, would be "illogical":

> "Where the State seeks to terminate parental rights, the 'finding of dependency' necessarily applies to the State to protect against an unwarranted intrusion into parental rights and to comply with the requirements of due process. ...
>
> "In viewing the 'dependency' issue in the context of the State's attempt to terminate parental rights, the State would have standing <u>only where both parents are found to be unfit or otherwise unable to discharge the responsibilities of parenthood</u>. ...
>
> "Conversely, <u>when one parent seeks to terminate the other parent's parental rights, a 'finding of dependency' is not required</u>. As stated above, if a 'finding of dependency' were a requisite element of proof, the following illogical result could arise:

---

was a parent (the petitioning, noncustodial parent) who alleged to be, and was found to be, a fit, willing, and able parent for the child. Based on its purported finding that the child was dependent, the Court of Civil Appeals held that the case was a dependency case within the jurisdiction of the juvenile court, rather than a mere custody dispute, which would have fallen within the jurisdiction of the circuit court. <u>T.K.</u>, 82 So. 3d at 4.

26

1121462

> The petitioning parent, who is adequately caring for the child, would have to prove that he or she is not providing adequate care for the child and, therefore, could then be estopped from bringing such an action. We hold, therefore, that, when one parent seeks to terminate the other parent's parental rights, a 'finding of dependency' is not required, and the trial court should determine whether the petitioner has met the statutory burden of proof and whether that termination is in the child's best interest, in light of the surrounding circumstances."

564 So. 2d at 954 (emphasis added). See also Ex parte W.E., 64 So. 3d 637, 638 (Ala. 2010)(Murdock, J., concurring specially)("[D]ependency is a status created by law that either is true of a child or is not. That is, either a child is dependent or it is not. A child cannot be dependent vis-à-vis one parent but not dependent as to the other parent. If the child is not dependent 'as to one parent,' then the child is not dependent."); Ex parte L.E.O., 61 So. 3d 1042, 1057 (Ala. 2010) (Murdock, J., dissenting)("The issue whether a child is a 'dependent child' ... begs the question, dependent on whom? The logical and obvious answer -- and the answer that has prevented the statute from being considered in conflict with [substantial] caselaw ... -- is quite simply, the State.").

27

1121462

Finally, I take particular note of the last reason given by the main opinion for the conclusion it reaches and how that final reason serves to buttress the other reasons given for that conclusion. As the main opinion notes, in § 2 of Act No. 2014-350, Ala. Acts 2014, the legislature explained:

> "The Legislature finds that its original intent in the adoption of Act 2008-277, the Alabama Juvenile Justice Act, was for a juvenile court to exercise exclusive original jurisdiction in all termination of parental rights proceedings. The amendatory language to Section 12-15-114, Code of Alabama 1975, provided in Section 1, is intended to be curative and shall apply retroactively for the purpose of ratifying and confirming the exercise of original jurisdiction of the juvenile court to hear and adjudicate termination of parental rights cases filed in juvenile court on and after January 1, 2009, and prior to the effective date of this act [April 8, 2014]."

With this language, the legislature intended to clarify and confirm the meaning of the 2008 amendments to the Alabama Juvenile Justice Act. Clarifying or confirming the intent of some previously adopted statute has been acknowledged and accepted as an appropriate purpose of a legislative enactment. Although a subsequent expression by a legislature of the intended meaning of some prior statute is not binding on this or any court in fulfilling its responsibility to interpret the prior statute, a subsequent expression of this nature

28

1121462

certainly should be considered. See, e.g, <u>Cofer v. Ensor</u>, 473 So. 2d 984, 1006 (Ala. 1985) ("'It is presumed that an amendment is made to effect some purpose, which may be either to alter the operation and effect of earlier provisions or to clarify the meaning thereof ....' 82 C.J.S. <u>Statutes</u> § 384, pp. 897-898 (1953)." (emphasis omitted)); <u>T-Mobile South, LLC v. Bonet</u>, 85 So. 3d 963, 979 (Ala. 2011) (cited in the main opinion for the proposition that an enactment in which the legislature "seeks to clarify" some previous statutory language must "be considered" by the court). Although I would be inclined to find sufficient to the task the other reasons stated by the main opinion for its conclusion, especially when those other reasons are considered cumulatively, I also fully agree with the main opinion that the language of the Act No. 2014-350 amendment means that there can be no appreciable doubt at to that conclusion.

Stuart, J., concurs.

29

1121462

BOLIN, Justice (concurring in the result).

I agree with the majority that the juvenile courts of this State have jurisdiction over a termination-of-parental rights petition when the grounds for the petition do not involve a child alleged "to have committed a delinquent act, to be dependent, or to be in need of supervision." § 12-15-114(a), Ala. Code 1975, a provision of the Alabama Juvenile Justice Act, § 12-15-101 et seq., Ala. Code 1975 ("the AJJA"). However, I believe that Act No. 2014-350, Ala. Acts 2014, which amended the AJJA and which became effective while this appeal was pending ("the 2014 amendments"), establishes that the juvenile courts have jurisdiction over all petitions seeking the termination of parental rights, even as between the parents. The legislature, in expressing its intent that the 2014 amendments apply retroactively, also stated that those amendments are "curative." That is, the 2014 amendments, in my opinion, remedy any jurisdictional conflict created by the Court of Civil Appeals' holding that a fit custodial parent could not bring a termination-of-parental-rights petition against the other parent because the child of

30

the fit custodial parent could not be considered "dependent," i.e., in need of care and supervision.

I recognize that retroactive application of a statute is generally not favored, absent an express statutory provision or clear legislative intent that the enactment apply both retroactively and prospectively. See Ex parte Bonner, 676 So. 2d 925 (Ala. 1995)(statutory amendment providing for the waiver of the cost of a bond upon a showing of substantial hardship applied retroactively); Jones v. Casey, 445 So. 2d 873 (Ala. 1983)(statutory amendment raising the interest rate on judgments did not apply retroactively). "The general rule is that retrospective application of a statute is not favored and legislative intent to make a statute retrospective must be clearly expressed before the statute will be construed to operate retrospectively." Kittrell v. Benjamin, 396 So. 2d 93, 94 (Ala. 1981)(statute allowing a sale of property for division of proceeds applied retroactively).

The United States Supreme Court in Landgraf v. USI Film Products, 511 U.S. 244 (1994), considered whether an amendment to the Civil Rights Act of 1991, which permitted a party to seek compensatory and punitive damages for certain types of

intentional employment discrimination and to demand a jury trial if such damages are sought, applied to an employment-discrimination case that was pending on appeal when the amendment became effective. The Supreme Court in Landgraf stated: "When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach. If Congress has done so, of course, there is no need to resort to judicial default rules." 511 U.S. at 280. The Landgraf Court went on to set out the applicable analysis when the statute contains no such expressed intent. See also Lindh v. Murphy, 521 U.S. 320 (1997)(discussing Landgraf and the rules of statutory construction used to ascertain a statute's temporal scope).

In the present case, the legislature expressed its clear intent that the 2014 amendments apply retroactively.

> "[W]hen a lawmaking body thoughtfully considers the burdens and benefits of retroactively applying a law and makes clear its intent that the law have legal consequence in pending cases, courts must follow the law's intent. See Landgraf v. USI Film Prods., 511 U.S. 244, 272, 114 S.Ct. 1483, 128 L.Ed. 2d 229 (1994). This is especially true in cases that merely change the jurisdiction from one forum to another.

> "'We have regularly applied intervening statutes conferring or ousting jurisdiction, whether or not jurisdiction lay when the underlying conduct occurred or when the suit was filed. ... Application of a new jurisdictional rule usually "takes away no substantive right but simply changes the tribunal that is to hear the case."'
>
> "Landgraf, 511 U.S. at 274, 114 S.Ct. 1483 (citing Hallowell v. Commons, 239 U.S. 506, 36 S.Ct. 202, 60 L.Ed. 409 (1916))."

Dickinson v. Cosmos Broad. Co., 782 So. 2d 260, 269 (Ala. 2000)(retroactive application of federal agency's declaratory ruling did not violate plaintiffs' due-process rights).

The next question is whether retroactive application is constitutionally permissible. Retroactive application is prohibited regardless of legislative intent if so applying the statute would impair vested rights or create new obligations.

In Harlan v. State, 31 Ala. App. 478, 18 So. 2d 744 (1944), the Court of Appeals explained that a retrospective law is one that takes away or impairs vested rights acquired under existing laws or creates a new obligation and imposes a new duty or attaches a new disability in light of considerations or transactions already past. In contrast, "'[r]emedial statutes -- those which do not create, enlarge,

33

diminish, or destroy vested rights -- are favored by the courts, and their retrospective operation is not obnoxious to the spirit and policy of the law.'" Ex parte Burks, 487 So. 2d 905, 907 (Ala. 1985)(quoting Barrington v. Barrington, 200 Ala. 315, 316, 76 So. 81, 82 (1917)). Remedial statutes are exemplified by those that "'impair no contract or vested right, ... but preserve and enforce the right and heal defects in existing laws prescribing remedies.'" Jones v. Casey, 445 So. 2d 873, 875 (Ala. 1983)(quoting Dickson v. Alabama Mach. & Supply Co., 18 Ala. App. 164, 165, 89 So. 843, 844 (1921)). A remedial statute "may be applied on appeal, even if the effective date of that statute occurred while the appeal was pending, and even if the effective date of the statute was after the judgment in the trial court." Kittrell v. Benjamin, 396 So. 2d at 95.

The Landgraf Court stated that a statute has retroactive effects if the statute

"attaches new legal consequences to events completed before its enactment. The conclusion that a particular rule operates 'retroactively' comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event. ... [F]amiliar considerations

34

1121462

> of fair notice, reasonable reliance, and settled expectations offer sound guidance."

Landgraf, 511 U.S. at 270.

The Supreme Court in Landgraf also noted jurisdiction-conferring and jurisdiction-ousting statutes as examples of statutes often properly applied to pre-enactment events. "Application of a new jurisdictional rule," the Court instructed, "usually takes away no substantive right but simply changes the tribunal that is to hear the case." 511 U.S. at 274. Additionally, "[p]resent law normally governs in such situations because jurisdictional statutes speak to the power of the court rather than to the rights or obligations of the parties." Id.

Three years after Landgraf, the United States Supreme Court in Lindh v. Murphy, 521 U.S. 320 (1997), applied and clarified the Landgraf analysis for determining retroactivity. The Lindh Court further elaborated on the distinction between procedural and substantive changes. The Supreme Court noted that if a statute is "merely procedural in a strict sense (say, setting deadlines for filing and disposition ...), the natural expectation would be that it would apply to pending cases." 521 U.S. at 327 (citing Landgraf, 511 U.S. at 275).

35

1121462

But because the Court found that the statutory changes at issue in Lindh —- the "revisions of prior law to change standards of proof and persuasion in a way favorable to a State" —- went "beyond 'mere' procedure to affect substantive entitlement to relief," it held that the statute did not fall within the Court's "express (albeit qualified) approval of applying such statutes to pending cases." 521 U.S. at 327-28. Instead, the Supreme Court relied on what it held to be a clear expression of congressional intent that the amendments to chapter 153 effected by the Antiterrorism and Effective Death Penalty Act ("the AEDPA") not apply to noncapital cases that were already pending when the AEDPA was enacted. The Court explained, "[t]he statute reveals Congress's intent to apply the amendments to chapter 153 only to such cases as were filed after the statute's enactment." 521 U.S. at 326.

In Hughes Aircraft Co. v. United States, 520 U.S. 939 (1997), the Supreme Court confirmed that the general presumption against retroactivity affects jurisdiction-allocating statutes to the same extent it affects other legislation. The issue in Hughes Aircraft was a 1986 amendment to the False Claims Act that expanded the range of

circumstances under which private parties can bring suit "on behalf of the United States against anyone submitting a false claim to the Government." 520 U.S. at 941. Congress did not make its intention regarding retroactivity clear, and, after conducting the analysis outlined in Landgraf, the Supreme Court concluded that the 1986 amendment did not apply where the defendant had submitted the alleged false claims before 1986 and a private person could not have brought suit based on those claims under the pre-amendment version of the False Claims Act. 520 U.S. at 946–51.

In rejecting the plaintiff's argument that the 1986 amendment was exempt from the Landgraf presumption against retroactivity because the statute it amended was a jurisdictional statute, the Supreme Court clarified Landgraf, stating:

> "The fact that courts often apply newly enacted jurisdiction-allocating statutes to pending cases merely evidences certain limited circumstances failing to meet the conditions for our generally applicable presumption against retroactivity, not an exception to the rule itself .... As we stated in Landgraf:
>
> > "'Application of a new jurisdictional rule usually "takes away no substantive right but simply changes the tribunal that is to hear the case." Present law normally

37

> governs in such situations because jurisdictional statutes "speak to the power of the court rather than to the rights or obligations of the parties."'
>
> "Statutes merely addressing <u>which</u> court shall have jurisdiction to entertain a particular cause of action can fairly be said merely to regulate the secondary conduct of litigation and not the underlying primary conduct of the parties. Such statutes affect only <u>where</u> a suit may be brought, not <u>whether</u> it may be brought at all. The 1986 amendment, however, does not merely allocate jurisdiction among forums. Rather, it <u>creates</u> jurisdiction where none previously existed; it thus speaks not just to the power of a particular court but to the substantive rights of the parties as well. Such a statute, even though phrased in 'jurisdictional' terms, is as much subject to our presumption against retroactivity as any other."

<u>Hughes Aircraft</u>, 520 U.S. at 951 (citation omitted).

In <u>Republic of Austria v. Altmann</u>, 541 U.S. 677 (2004), the Supreme Court addressed whether the Federal Service Immunity Act ("the FSIA") applied to conduct that occurred prior to the enactment of the FSIA in 1976.  The plaintiff in <u>Altmann</u> sued the Republic of Austria for expropriating, before and after World War II, paintings owned by her family. Austria asserted sovereign immunity as a defense.  In answering the question, the Supreme Court looked to the FSIA and noted that the preamble suggested that it applied to pre-enactment conduct but that it fell short of an express

38

prescription of the statute's temporal reach. The Supreme Court applied Landgraf and asked whether the FSIA affected substantive rights and would be impermissibly retroactive if applied to pre-enactment conduct or addressed procedural matters and may be applied to all pending cases, regardless of when the underlying conduct occurred. The Court noted that under Landgraf there is a presumption against retroactivity if Congress has not expressly stated that the statute is to have retroactive effect and the statute affects rights, liabilities, or duties with respect to past conduct. 541 U.S. at 693-94 (citing Landgraf, 511 U.S. at 280). On the other hand, the Supreme Court noted that the application of a statute to future as well as to pending cases would be sanctioned if the statute merely confers or ousts jurisdiction. 541 U.S. at 693. The Supreme Court concluded that, although these principles seemed comprehensive, they did not provide a clear answer in the case before it, because the FSIA could not be categorized as exclusively affecting either substantive rights or procedural matters. 541 U.S. at 694. The Supreme Court then noted that the purpose of the anti-retroactivity presumption is "to avoid unnecessary post hoc

39

1121462

changes to legal rules on which parties relied in shaping their primary conduct" and that that had never been the purpose of foreign sovereign immunity. 541 U.S. at 696. Rather, the Supreme Court stated, foreign sovereign immunity aims to protect foreign states "'from the inconvenience of suit as a gesture of comity.'" 541 U.S. at 696 (quoting Dole Food Co. v. Patrickson, 538 U.S. 468, 479 (2003)). The Supreme Court then looked to the FSIA and the circumstances surrounding its enactment for any suggestion that it should not apply to the 1948 conduct by Austria refusing to return the paintings at issue. 541 U.S. at 697. In holding that the FSIA applies "to all pending cases regardless of when the underlying conduct occurred," the Supreme Court relied on "[t]he FSIA's overall structure" as well as "two of the Act's principal purposes: clarifying the rules that judges should apply in resolving sovereign immunity claims and eliminating political participation in the resolution of such claims." 541 U.S. at 698-99. The Supreme Court also looked to Congress's understanding of the FSIA as noted in its preamble, which provides that "'[c]laims of foreign states to immunity should henceforth be decided by courts of the United States and of

40

1121462

the States in conformity with the principles set forth in'" the FSIA. 541 U.S. at 697 (quoting 28 U.S.C. § 1602). The Supreme Court noted that pursuant to this language in the FSIA "[i]mmunity 'claims' -- not actions protected by immunity, but assertions of immunity to suits arising from those actions -- are the relevant conduct regulated by the [FSIA]." Id.

In Hamdan v. Rumsfield, 548 U.S. 557 (2006), the Supreme Court addressed the Detainee Treatment Act of 2005 ("the DTA"), in particular § 1005(e)(1) of the DTA, which provided that no court shall have jurisdiction to hear an application for habeas corpus filed by an alien detained at Guantanamo Bay. No provision of the DTA stated whether subsection (e)(1) applied to pending cases. The government argued that this subsection had the immediate effect, upon enactment, of repealing federal jurisdiction over detainee actions pending in any federal court. The Supreme Court decided that Congress's failure to include language that subsection (e)(1) applied to pending habeas actions was a deliberate choice. The Supreme Court refused to dismiss Hamdan's habeas case for lack of jurisdiction because it was pending when the DTA was enacted. In response to the Hamdan decision, Congress passed

the Military Commissions Act of 2006 ("the MCA"), which amended 28 U.S.C. § 2241(e), stripping jurisdiction of the federal courts over pending habeas corpus petitions and expressing its intent to apply the amendments in all pending cases. In Boumediene v. Bush, 553 U.S. 723, 738 (2008), the Supreme Court stated: "[W]e cannot ignore that the MCA was a direct response to Hamdan's holding that the DTA's jurisdiction-stripping provision had no application to pending cases." Ultimately, the Supreme Court concluded that the amendments stripping the federal courts of jurisdiction to hear habeas corpus petitions filed by enemy combatants were an unconstitutional suspension of the writ of habeas corpus under Article I, § 9, of the United States Constitution.

In the present case, former § 12-15-30(a), Ala. Code 1975 (repealed), gave the juvenile courts exclusive original jurisdiction over proceedings for the termination of parental rights. Former § 26-18-5, Ala. Code 1975 (repealed), a provision of the Child Protection Act, permitted a parent to bring a termination-of-parental-rights proceeding, and our caselaw concluded that the finding of dependency when one parent sought to terminate the other parent's parental rights

1121462

was not necessary. Ex parte Beasley, 564 So. 2d 950 (Ala. 1990). The 2008 amendments to an earlier version of the Juvenile Justice Act, which resulted in the AJJA, set out the juvenile court's exclusive original jurisdiction over termination-of-parental-rights proceedings in § 12-15-114. Those same 2008 amendments provided a parent with the right to bring a termination-of-parental-rights action. See § 12-15-317, Ala. Code 1975. However, § 12-15-114 purported to limit the juvenile court's jurisdiction to termination proceedings "arising out of" allegations of delinquency, dependency, or a child in need of supervision. A majority of the Court of Civil Appeals essentially concluded in this case that, because a fit custodial parent could not allege dependency, then the juvenile court lacked jurisdiction over the petition filed by L.J. ("the mother") seeking to terminate the parental rights of C.C. ("the father") under the 2008 amendments. C.C. v. L.J., [Ms. 2120534, Sept. 6, 2013] ___ So. 3d ___ (Ala. Civ. App. 2013). The 2014 amendments amended § 12-15-114 to clarify that the juvenile court had jurisdiction over all termination-of-parental-rights actions and expressed the

43

1121462

legislature's intent that the amendments were to apply retroactively.

I discern no constitutional impediment to retroactively applying the 2014 amendments to § 12-15-114. In addressing retroactivity, a court is concerned with "familiar considerations of fair notice, reasonable reliance, and settled expectations." Landgraf, 511 U.S. at 270. The juvenile court continues to have exclusive original jurisdiction over termination-of-parental-rights proceedings as it did before and after the 2014 amendments. The 2014 amendments do not take away or give the right to a parent to bring a termination proceeding because § 12-15-317 already provides for such. I believe that applying the 2014 amendments retroactively gives effect to the clear intent of the legislature, which included in the 2014 amendments express language regarding retroactivity, ensuring that the legislature considered whether the benefits of retroactivity outweighed any potential unfairness.

The father argues that "legislation that so boldly robs a father of such a powerful defense [lack of jurisdiction] clearly affects his substantive, vested rights if applied

44

retroactively." However, "jurisdictional statutes 'speak to the power of the court rather than to the rights or obligations of the parties.'" Landgraf, 511 U.S. at 274 (quoting Republic Nat'l Bank of Miami v. United States, 506 U.S. 80, 100 (Thomas, J., concurring)). Jurisdiction is not a right possessed by the parties, but is instead the power of the court. The Supreme Court has "regularly applied intervening statutes conferring or ousting jurisdiction, whether or not jurisdiction lay when the underlying conduct occurred or when the suit was filed." Landgraf, 511 U.S. at 274. The Supreme Court has established the principle that in determining retroactivity jurisdictional statutes should be evaluated in the same manner as any other statute. Thus, in order to determine whether a statute applies to a case that was filed prior to the enactment of the statute, courts must determine whether the statute is "procedural" in nature or whether it affects "substantive entitlement to relief." Lindh, 521 U.S. at 327. Does the statute merely "regulate the secondary conduct of litigation" or does it affect "the underlying primary conduct of the parties"? Hughes, 520 U.S. at 951. Does the statute speak "just to the power of a

1121462

particular court," or does it speak to "the substantive rights of the parties as well"? Hughes, 520 U.S. at 951. In this case, the 2014 amendments speak to jurisdiction.

The father argues that the 2014 amendments violate the separation-of-powers doctrine and cites Barrington v. Barrington, 200 Ala. 315, 76 So. 81 (1917). In Barrington, a new statute meant to protect women from actual or threatened violence granted the wife a divorce when she, without support from the husband, had lived separate and apart from the bed and board of her husband for five years preceding the filing for divorce. Although the wife had lived "separate and apart" from the husband for five years, the new statute authorizing divorce under such circumstances had not been in effect for five years at the time she filed for divorce. The husband demurred, asserting that to permit divorce under the new statute would constitute a constitutionally prohibited retroactive application of a statute that was not, on its face, retroactive. The Court agreed, stating: "We are, upon these considerations, constrained to hold that the statute in question authorizes the divorce here sought only upon the lapse of five years from and after the date of its enactment

46

1121462

-- September 10, 1915." <u>Barrington</u>, 200 Ala. at 318, 76 So. at 84. The statute that was under consideration in <u>Barrington</u>, however, is readily distinguishable from the 2014 amendments, which are not only expressly retroactive, but also do not alter vested rights (i.e., contract or property rights). In contrast, the new statute in <u>Barrington</u> was not expressly retroactive, and it did alter vested property rights:

"The legislative act here involved is not remedial in character, but gives legal effect to marital conduct and relations, by converting any complete separation between husband and wife for five years next before the filing of the bill of complaint, into an authorized ground of divorce in favor of the wife, if she has so lived without support from him. It falls fairly within the class of acts whose retrospective operation is so strongly disfavored by the law, and so consistently reprobated by the courts."

200 Ala. at 316, 76 So. at 82. The Court went on to say:

"Remedial statutes -- those which do not create, enlarge, diminish, or destroy vested rights -- are favored by the courts, and their retrospective operation is not obnoxious to the spirit and policy of the law.

"But a statute which gives a new legal effect to conduct or conditions occurring or existing prior to its enactment, thereby imposing upon any person unanticipated disabilities or alterations of legal status, is retrospective in a sense which is odious to the law, and, as to such operation, is strongly disfavored by the courts, even though it does not offend the Constitution by impairing the obligation

47

1121462

> of a contract or by creating a crime or punishment ex post facto. This disfavor has everywhere found expression in a rigorous rule of construction which denies retroactive effect to such a statute unless by its express terms, or by unmistakable implication, the Legislature must have so intended."

Barrington, 200 Ala. at 316, 76 So. at 82. In the present case, the 2014 amendments do not give new legal effect to abandonment by a parent.

In arguing that the 2014 amendments violate the separation-of-powers doctrine, the father refers this Court to Justice Mayfield's special concurrence in Barrington, in which he stated:

> "Granting divorces is the exercise of powers and functions either legislative or judicial. If legislative, under our Constitution, then only the Legislature can exercise them, the courts cannot; if judicial, then only the courts or the judicial department of the state can exercise the powers. Assuredly, the power or function to decree divorces does not belong to both these branches of government. I take it that there never would have been a doubt on this subject but for the fact that in England Parliament has for centuries granted divorces; but this does not prove that it is the exercise of legislative powers, because Parliament -- different in this from all American Legislatures, state or federal -- exercises both legislative and judicial powers and functions of the English government. Our Constitution, like most all other written American Constitutions, expressly prohibits the Legislature from exercising judicial powers, and also prohibits the judicial department from exercising legislative powers. So it results that granting divorces, under

48

the law of this state, is the exercise of powers and functions of the state government, either legislative or judicial, and that it cannot be the exercise of both classes of powers. If it be a judicial power and function, the Legislature cannot usurp it by saying that the courts shall grant divorces without cause, and without any issuable fact being alleged or proven.

"The Legislature may prescribe rules under which judicial power shall be exercised, but it cannot authorize courts to proceed to judgment against, or to adjudicate upon, the rights of parties without giving them notice of the proceeding and an opportunity to defend; nor can it deprive the litigant of his rights, by retrospective legislation which makes void that which was theretofore valid, or vice versa. There are some things Legislatures cannot do. What they do must be within legislative competency. They cannot recall the past. ...

"The Legislature can say what the law thereafter shall be, but not what it was theretofore; what it shall be to-morrow, but not what it was yesterday; that is not its province or its function. If an act is done to-day, according to law, the Legislature cannot say to-morrow that the act was unlawful. If a contract is made to-day according to law, and is therefore valid, the Legislature will have no power to-morrow to say that it was not made according to law, and is therefore void, and annul it. It can say that a contract made hereafter, as a former one was made, shall be void, but it cannot make void a contract heretofore made and executed, if valid when made, nor make valid a contract executed in the past, if it was void when made. This is not within legislative competency, and therefore needs no express constitutional inhibition. The Legislature can no more recall the past than it can make black white, or white black, or change the laws of physics or other natural laws. A state Legislature can, of course, do anything within legislative competency

49

which is not inhibited by the state and federal Constitutions; but it needs no inhibition to prevent its doing what, in the very nature of things, according to natural or Divine law, it cannot do. The Constitution itself could not empower the Legislature to recall the past, or to change a law of physics. Why expressly inhibit the doing of a thing which cannot be done by any human power or agency, much less authorized?"

200 Ala. at 324-25, 76 So. at 90. As I stated earlier, the 2014 amendments do not give new legal effect to abandonment by a parent because that conduct is, and has been, subject to the termination of the abandoning parent's rights.

I agree with Justice Mayfield that the legislature possesses the power to amend the law, "but it may not do so in a manner that impinges on the judicial power by retroactively changing the laws that were incorporated into the judgment when it became final." Ex parte Jenkins, 723 So. 2d 649, 658 (Ala. 1998). In Plaut v. Spendthrift Farm, 514 U.S. 211 (1995), the Supreme Court acknowledged that Congress possesses the power to amend existing law even if the amendment affects the outcome of pending cases. 514 U.S. at 218. The Supreme Court explained that in such a situation the separation-of-powers doctrine is violated only when Congress tries to apply new law to cases that have already reached a final judgment.

1121462

514 U.S. at 226 ("Congress can always revise the judgments of Article III courts in one sense: When a new law makes clear that it is retroactive, an appellate court must apply that law in reviewing judgments still on appeal that were rendered before the law was enacted, and must alter the outcome accordingly."). Legislation that would change the law incorporated into a final judgment rendered by the judiciary violates the separation-of-powers doctrine. The Supreme Court recognized that Congress's retroactive extension of a limitations period does not violate the Due Process Clause by depriving defendants of a vested right. Plaut, 514 U.S. at 227-29 (stating that Congress may retroactively extend a limitations period without violating the Due Process Clause (citing Chase Sec. Corp. v. Donaldson, 325 U.S. 304, 311 n. 8, 316 (1945)(noting that the retroactive extension of a statutory limitations period did not deprive defendants of a "vested right"))). Nonetheless, the Supreme Court held that Congress violated the separation-of-powers doctrine by commanding the Judiciary to reopen final judgments to accommodate the extended limitations period. Plaut, 514 U.S. at 219.

1121462

*Plaut* involved Congress's reaction to the Supreme Court's earlier decision in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350 (1991), in which the Court adopted a uniform national limitations period for civil actions under § 10(b) of the Securities Exchange Act of 1934. After *Lampf* was decided, a number of § 10(b) actions were dismissed as untimely, and Plaut's case was among them. Plaut did not appeal the dismissal. Some months later, Congress enacted a complicated statute that rejected the *Lampf* holding for cases filed before *Lampf* was decided and effectively required a court to reinstate a § 10(b) action on the motion of the plaintiff if the action would have been considered timely under the applicable law as of the day before *Lampf* was decided. The Supreme Court distilled from prior cases the principle that Article III grants the federal courts "the power, not merely to rule on cases, but to decide them, subject to review only by superior courts in the Article III hierarchy." *Plaut*, 514 U.S. at 218-19. The Court concluded that "[b]y retroactively commanding the federal courts to reopen final judgments, Congress has violated this fundamental principle." 514 U.S. at 219. The Supreme Court was careful

52

1121462

to distinguish the situation in which Congress enacts a law with retroactive effect while a case is still on appeal, recognizing that, in that instance, the appellate court must apply the new law. The Supreme Court stated:

"It is true, as petitioners contend, that Congress can always revise the judgments of Article III courts in one sense: When a new law makes clear that it is retroactive, an appellate court must apply that law in reviewing judgments still on appeal that were rendered before the law was enacted, and must alter the outcome accordingly. See United States v. Schooner Peggy, 1 Cranch 103 (1801); Landgraf v. USI Film Products, 511 U.S. 244, 273-280 (1994). Since that is so, petitioners argue, federal courts must apply the 'new' law created by § 27A(b) in finally adjudicated cases as well; for the line that separates lower court judgments that are pending on appeal (or may still be appealed), from lower-court judgments that are final, is determined by statute, see, e.g., 28 U.S.C. § 2107(a)(30-day time limit for appeal to federal court of appeals), and so cannot possibly be a constitutional line. But a distinction between judgments from which all appeals have been forgone or completed, and judgments that remain on appeal (or subject to being appealed), is implicit in what Article III creates: not a batch of unconnected courts, but a judicial department composed of 'inferior Courts' and 'one supreme Court.' Within that hierarchy, the decision of an inferior court is not (unless the time for appeal has expired) the final word of the department as a whole. It is the obligation of the last court in the hierarchy that rules on the case to give effect to Congress's latest enactment, even when that has the effect of overturning the judgment of an inferior court, since each court, at every level, must 'decide according to existing laws.' Schooner Peggy, supra, 1 Cranch, at 109. Having achieved finality, however, a judicial

53

decision becomes the last word of the judicial department with regard to a particular case or controversy, and Congress may not declare by retroactive legislation that the law applicable to that very case was something other than what the courts said it was. Finality of a legal judgment is determined by statute, just as entitlement to a government benefit is a statutory creation; but that no more deprives the former of its constitutional significance for separation-of-powers analysis than it deprives the latter of its significance for due process purposes. See, e.g., Cleveland Bd. of Ed. v. Loudermill, 470 U.S. 532 (1985); Meachum v. Fano, 427 U.S. 215 (1976).

"To be sure, § 27A(b) reopens (or directs the reopening of) final judgments in a whole class of cases rather than in a particular suit. We do not see how that makes any difference. The separation-of-powers violation here, if there is any, consists of depriving judicial judgments of the conclusive effect that they had when they were announced, not of acting in a manner -- viz., with particular rather than general effect -- that is unusual (though, we must note, not impossible) for a legislature. To be sure, a general statute such as this one may reduce the perception that legislative interference with judicial judgments was prompted by individual favoritism; but it is legislative interference with judicial judgments nonetheless. Not favoritism, nor even corruption, but power is the object of the separation-of-powers prohibition. The prohibition is violated when an individual final judgment is legislatively rescinded for even the very best of reasons, such as the legislature's genuine conviction (supported by all the law professors in the land) that the judgment was wrong; and it is violated 40 times over when 40 final judgments are legislatively dissolved."

Plaut, 514 U.S. at 226-28 (some emphasis added).

54

1121462

In Ex parte Jenkins, supra, this Court addressed, among other things, whether the separation-of-powers doctrine was violated by the retroactive application of a statute permitting the reopening of a final judgment of paternity based on scientific evidence that the adjudged father was in fact not the biological father. Relying on Plaut, supra, we held that the Alabama Legislature cannot retroactively amend Rule 60(b), Ala. R. Civ. P., to change the law of finality that was incorporated into final judgments before the legislature's amendment allowing a father to reopen a final judgment of paternity without regard to the "reasonable time" requirement of Rule 60(b)(6), Ala. R. Civ. P. The paternity judgment in that case became final in 1986, approximately eight years before § 26-17A-1, Ala. Code 1975, became law. Thus, this Court held that the trial court and the Court of Civil Appeals erred in applying § 26-17A-1 to change the rules of finality incorporated into the father's 1986 final judgment of paternity in Jenkins.

As I stated earlier, the legislature, in expressing its intent that the 2014 amendments apply retroactively, also stated that the amendments are "curative." That is, the 2014

55

amendments remedy any jurisdictional conflict created by the Court of Civil Appeals' opinion that a fit custodial parent could not bring a termination-of-parental-rights petition against the other parent because the child of a fit custodial parent could not be considered dependent, i.e., in need of care and supervision. In Landgraf, 511 U.S. at 267-68, the Supreme Court stated:

> "Retroactivity provisions often serve entirely benign and legitimate purposes, whether to respond to emergencies, to correct mistakes, to prevent circumvention of a new statute in the interval immediately preceding its passage, or simply to give comprehensive effect to a new law Congress considers salutary. However, a requirement that Congress first make its intention clear helps ensure that Congress itself has determined that the benefits of retroactivity outweigh the potential for disruption or unfairness."

Here, by making its intention abundantly clear, the Alabama Legislature demonstrated its determination that the benefits of retroactivity outweighed any potential for disruption or unfairness. In light of the "modest" constitutional impediments to retroactive civil litigation, Landgraf, 511 U.S. at 272, the nature and extent of the change in the law, and the degree of connection between operation of the new law and relevant past conduct, applying the 2014

1121462

amendments retroactively comports with the <u>Landgraf</u> Court's considerations of fair notice, reasonable reliance, and settled expectations. Accordingly, there is no need to analyze whether the AJJA, before the enactment of the 2014 amendments, allowed a parent to terminate the parental rights of the other parent.

1121462

SHAW, Justice (concurring in the result).

I concur in the result. While this case was pending on appeal, Act No. 2014-350, Ala. Acts 2014, became effective and retroactively granted the juvenile court subject-matter jurisdiction in this case. I believe that Act No. 2014-350 is clear and constitutional and that its application complies with numerous authorities approving the retroactivity of statutory law. See, e.g., Dickinson v. Cosmos Broad. Co., 782 So. 2d 260 (Ala. 2000), and Landgraf v. USI Film Prods., 511 U.S. 244 (1994).